WARD SAND AND MATERIALS COMPANY, PLAINTIFF-AP-
PELLANT, v. DWIGHT R. G. PALMER, COMMISSIONER
OF THE STATE HIGHWAY DEPARTMENT OF NEW
JERSEY, DEFENDANT-RESPONDENT.

Argued November 22 and 23, 1965—
Reargued February 20 and 21, 1967—Decided January 22, 1968.

Mr. *Louis B. LeDuc for* plaintiff-appellant.

Mr. *David A. Biederman,* Deputy Attorney General, for defendant-respondent (*Mr. Avrom J. Gold,* Deputy Attorney General, on the brief; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

*Mr. Michael I. Sovern,* of the New York bar, for The Commission to study Meadowland Development, *amicus curiae (Messrs. Meyner and Wiley,* attorneys).

The opinion of the court was delivered by

HANEMAN, J. Plaintiff appealed to the Appellate Division from the dismissal of an action in lieu of prerogative writs which sought to compel the State Highway Department (Department) to condemn land upon which the State had constructed a portion of a State Highway. This Court granted certification on plaintiff's motion. *R. R.* 1:10–1A.

Prior to September 8, 1960, the Department constructed a jug handle at the juncture of Route 43 and Hylton Road in the Township of Pennsauken. On that date plaintiff was notified by the Department that unless it would accept an offer of $2,000 for a conveyance of the land upon which the construction had been completed, the Department would institute condemnation proceedings. Subsequent correspondence between the parties, resulted in a rejection of the offer and finally termination of negotiations and an assertion of title in the State by the Department. Plaintiff thereupon undertook this action in order to compel condemnation by the Department.

After plenary trial, the court found that prior to 1888 the upland owners constructed a bank or dyke at the low water mark which excluded the tidal flow from meadows of which the subject lands were a part. Originally, the bank contained a sluice gate which, when opened, permitted the tide to overflow these lands. In the course of time, this gate was permitted to fall into disrepair and was finally entirely demolished 50 years or more ago, reinundating the lands at high tide. From that date to the initiation of the highway construction the lands were tideflowed. These facts are accepted as true by the litigants. The trial court found that as the land was tideflowed, the title was vested in the State when possession was taken by the Department and dismissed plaintiff's action.

The primary issue before this Court is therefore, whether plaintiff's predecessors in title ever became vested with title by the exclusion of the tide and if the answer to that question is in the affirmative whether that title was thereafter lost to the State because the land subsequently again became tideflowed.

I

### Title

Neither party disputes that at some undisclosed and probably unascertainable time prior to 1888, the meadowlands here involved were, in their natural state, tideflowed, and that thereafter, sod banks were constructed along the edge of the stream in the vicinity of the low water mark thus excluding the tide. The question naturally arises as to the right to so exclude and the impact upon title of such exclusion.

At this late date, there can be no doubt that generally title to lands flooded at mean high tide is vested in the State. *O'Neill v. State Highway Department of New Jersey,* 50 *N. J.* 307 (1967).

From early colonial days into the middle of the last century there existed a local state common law or custom under which the owner of the upland at the high water mark had the privilege or license of reclaiming tideflowed lands adjacent to such holdings to the low water mark. When this privilege was exercised, the State became divested of and the ripa owner became vested with absolute title to the lands so reclaimed.

In *Bell v. Gough,* 23 *N. J. L.* 624 (*E. & A.* 1852), in holding that the owners of land bounding on navigable waters had the right to wharf out and otherwise reclaim the land down to the low water mark, the court said at *p.* 658:

"The usage to do so from the earliest settlement of the country has been universal; and until recently the right to do so was never questioned, either by individuals or by the government. A vast

amount of labor and capital has been thus expended, to the great benefit of the community. Not only wild marshes, overflowed at extraordinary tides, but large tracts of mud flats lying below the ordinary high water line of our rivers and navigable creeks, such as by the common law of England are held to be the property of the sovereign, and such as in the case of *Lowe v. Govett* (3 *B. & Add.* 863) were the subjects of a parliamentary grant, have been embanked and reclaimed, and by great expense transformed from a perfectly useless to a very valuable and productive property, by individuals or companies who never thought of obtaining grants for them, or licenses to use them from the crown or the colonial government or the state. The mud flats lying outside of the banks, and subject to the daily overflow of the tides, are now constantly resorted to for mud to repair the banks, and in many cases are indispensable to their maintenance.

There is the most ample evidence that this understanding and usage are of ancient date, and universal in all parts of the state. * * * "

This so-called "right" was subsequently denominated a "license". *Stevens v. Paterson & Newark R. R. Co.,* 34 *N. J. L.* 532 (*E. & A.* 1870). See also *Simpson v. Moorhead,* 65 *N. J. Eq.* 623 (*Ch.* 1904); *O'Neill v. State Highway Department of New Jersey, et al, supra.*

In 1851, the legislature enacted the "Wharf Act" (*L.* 1851, *p.* 335) which both adopted and superseded the local common law or custom. That act granted a revocable license to the riparian owner to "build docks or wharfs upon the shore, in front of his lands, and in any other way to improve the same". Shore was defined in the statute as follows:

"the term shore, in this act, shall be construed to mean the land between the limits of ordinary high and low water; the term shore line, to mean the edge of the water at ordinary high water, and the term shore owner, to mean the owner of the lands above and adjoining the shore line."

See *Simpson v. Moorhead,* 65 *N. J. Eq.* 623, 629 (*Ch.* 1904); *Leonard v. State Highway Dept.,* 24 *N. J. Super.* 376 (*Ch.* 1953), affirmed 29 *N. J. Super.* 188 (*App. Div.* 1954). When the lands were "so built upon or improved", the owner of the ripa could "appropriate the same to his own exclusive use", and claim title to the lands.

Some confusion has been raised as to the above conclusion by reference in the briefs to the so-called "Meadow Bank" statutes. See the compilation of the statutes at *R. S.* 15:5–8 and the previous rejection of the suggestion that compliance therewith plays some part in connection with the mechanics of vesting title in the ripa owner. *Leonard v. State Highway Dept., supra,* 29 *N. J. Super.,* at *p.* 193.

An individual could, until the years 1869 and 1891, as hereafter set forth, obtain title to lands between the high and low water marks by his own acts in excluding the tidewaters.

It is self-evident that adjacent owners of the ripa could, by pooling their efforts and jointly constructing a continuous bank along the low water mark, more economically and efficiently exclude the tidewater from the shore. Numerous side line dykes would thus be eliminated, the cost of maintenance of the dams would be spread among the adjacent owners, and the cooperative furnishing of labor would be of mutual benefit. Recognizing these advantages and being anxious to aid reclamation projects, the legislature from early times made provision for the cooperative undertaking of this type of improvement by enacting implementing statutes whose only purpose was the facilitation of the original and continued tidal exclusion. These statutes which became commonly known as "Meadow Bank" acts have no bearing on either the right to so exclude the tide or the genesis of title resulting from such exclusion.

It is, therefore, immaterial on the question of title whether the tidelands were here reclaimed by the efforts of one individual or a group of owners acting under one or more of the above or similar statutes.

*L.* 1869, *c.* 383, § 3, *p.* 1018 repealed the 1851 "Wharf Act" as to the "tidewaters of the Hudson river, New York bay and Kill Von Kull, below the line of mean high tide", and *L.* 1891, *c.* 124, *p.* 216, repealed said act as to the balance of the State. See *O'Neill v. State Highway Department of New Jersey, supra.* Said statutes also affirma-

tively barred the restoration of the common law privilege of reclamation which existed *ante* 1851.

█ Plaintiff's title, however, resulting from the exercise of the privilege to exclude and the actual exclusion of tide-waters from the land here in question prior to 1891 cannot be affected by either the repealer of 1891 or the repealer of 1869, since the latter did not purport to touch these lands and the former could not affect title acquisition prior to its enactment. We must conclude, therefore, that title to these lands was vested in plaintiff.

## II

### EFFECT OF SUBSEQUENT FLOODING

We come to a consideration of the effect of the reinundation of the shore. This has long been a troublesome problem, unsolved by either statutory or decisional law. In *Perrine v. Warner*, 87 *N. J. L.* 166, at *pp.* 167–168 (*E. & A.* 1915), the court recognizing the impact of an answer to that query stated:

"The principal question argued before us was whether, after the abandonment of these lands to the forces of nature for over a third of a century, they are now a part of the riparian lands of the state, open to public user by the people thereof, or whether the title thereto still remains in its reclaimers, and those holding under them; * * *. * * * * * * * * . We do not find it necessary for the disposition of this case to decide this question; and, in view of the momentous importance of such a decision, affecting, as it must, vast amounts of property in all of our counties which are washed by the Atlantic ocean or Delaware bay, the value of which can hardly be estimated, we feel that we ought not to do so in a case where the property involved is of such comparatively small pecuniary worth."

Ordinarily, when what was once fast land has been lost by gradual erosion and is entirely submerged at high tide, title to the submerged soil is in the State. *Harz v. Board of Commerce and Navigation*, 126 *N. J. Eq.* 9 (*Ch.* 1939), affirmed *o. b.* 127 *N. J. Eq.* 341 (*E. & A.* 1940); *Leonard*

v. *State Highway Department of New Jersey,* 29 *N. J. Super.* 188 (*App. Div.* 1954); *Seacoast Real Estate Company v. American Timber Company,* 92 *N. J. Eq.* 219 (*E. & A.* 1920).

Plaintiff, however, argues that this general rule should not apply where private title originated, as here, from loss of title by the State through the actions of the ripa owner, condoned either by the common law or the Wharf Act, depending upon the date of the accomplishment of these actions. Plaintiff concludes that the State, having lost its title to the reclaimed land by the exclusion of tidewaters therefrom through the efforts of the adjacent owner, is forever barred from having title revested in it by subsequent reinundation by the tides.

Plaintiff likens its title to that obtained by a riparian grant of tideflowed lands subsequent to 1869 in part of the State or 1891 in the balance of the State.

The difference between the two situations lies in the fact that such a riparian grant conveys and terminates the State's interest for all time in specific lands in consideration of a payment to the State of the fair value of said lands. The State relinquishes forever whatever interest it had in the premises described in the grant.

■ On the other hand, the common law and *L.* 1851, *p.* 335 made the exclusion of the tide a condition for the vesting of title between the high and low water mark. Only when the tideflowed land became high land did title vest in the adjacent owner. The philosophy behind the doctrine was that in consideration of the economic benefits to be received by the colony and later, the state, the individual undertaking the improvement was entitled to a reward. The increase of valuable lands was thus stimulated. The benefits included, *inter alia,* the increase of arid and grazing lands for farming and permitted access to navigable waters, then the highways of the colony and state for commerce. See *Bell v. Gough, supra; Tide-water Company v. Coster,* 18 *N. J. Eq.* 518 (*E. & A.* 1866). When the land became

again tideflowed, fallow and of no use for agriculture or when docks or wharfs constructed thereon were destroyed and unusable, the economy of the State was no longer benefited and the consideration moving to the public was destroyed. We cannot read into either the common law or statute an intent to prevent the loss of title, which had its inception under the above common law or "Wharf Act", upon tidal reinundation. *Leonard v. State Highway Department of New Jersey, 29 N. J. Super.* 188 (*App. Div.* 1954).

This rule is subject to an exception however. Although what the Vice Chancellor had to say about the legal effect of submergence in *Simpson v. Moorhead,* 65 *N. J. Eq.* 623 (*Ch.* 1904) was *dictum,* the contemporary factual statements are of interest. The court there said, at *p.* 629 :

"The ownership of the title to these banked meadows was thus acquired by the riparian owners from the state, and it includes thousands of acres in the counties of Camden, Gloucester, Salem and Cumberland. The meadow company, created under the meadow statutes, consisted of the associated owners of those meadow lands which could be conveniently protected by one bank. In the use of the reclaimed lands, the owners often voluntarily permit them to be overflowed by the tidewater for their improvement by the deposit of silt and mud. It sometimes happens that the banks break and the tidewater comes over them against the will of the owners, who spend large sums to exclude it immediately, and after exclusion cultivate as before. At other times, although the breaches in the banks letting in the water may have occurred against the efforts of the owners, yet after they have happened the owners permit the lands to be subject to the overflow of the tide, sometimes for short periods, sometimes for long ones. * * *"

The reference to the voluntary flooding reflects a common practice. As was the case with the lands in question here, dykes were frequently constructed with a sluice gate by which the tide could be alternatively permitted to flow in and be excluded.

Indeed the Meadow Bank acts recognized the custom and extended the right to land owned by more than one person. Gen. Stat., *p.* 2035, *Sec.* 59. So extensive was this custom that it became recognized in the law as a right ap-

pended to title and did not result in the immediate loss of title to the State upon flooding. Similarly appended was the right to re-exclude the tide where the dyke was breached by a storm. See *Simpson v. Moorhead, supra*. The right to obtain title originally gave rise to the concurrent duty, however, to again exclude the tide within a reasonable time after the purposes of the voluntary flooding had been accomplished or after the involuntary breach had occurred. Although *Simpson* contains *dicta* to the effect that no case has ever allowed the State to re-claim land originally reclaimed and then re-flooded, this is without doubt due to the realization that:

"in no case has the overflow of such meadows by the tide, whether it happened by accident or design, ever been accompanied by a purpose to abandon the property. Almost invariably, during the period when overflow is permitted, some acts of ownership over the submerged lands are asserted by the owners." *P*. 631.

It is apparent from the above quotation that the Vice Chancellor limited his reasoning, which prevented loss of title by tide flow, to the owners of reinundated lands who asserted "some acts of ownership over the submerged lands" during the time it was again tideflowed, which evidenced a purpose not to "abandon the property". Implicit in such a statement is the inference that at some time or some point there would arise a conclusion that the owner had abandoned his possession, if not title.

In *Leonard v. State Highway Department of New Jersey*, 29 *N. J. Super.* 188 (*App. Div.* 1954) where the lands, originally salvaged by meadow banking, had been reinundated for 15 years, the court held that the failure to again exclude the tide for that period of time resulted in a vesting of the title in the State.

 Consistent with the foregoing we conclude that the title to lands reclaimed as above does not vest in the State immediately upon becoming again tideflowed. The title and right to possession remain vested in the private owner, for

a reasonable period of time—a time sufficient to accord him the opportunity to again exclude the tide. Such a period should balance the interests of the State in having constructive use made of the lands against the practical problems of the landowner in deciding to re-exclude the tide, as well as the problems which may arise in the reconstruction of dykes.

The lands here involved having been tideflowed for more than fifty years, we need hardly say a reasonable time for re-exclusion of the tide has long since expired.

Judgment affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.