WILLIAM L. GORMLEY, INDIVIDUALLY AND AS A MEMBER OF THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, RESPONDENT AND CROSS-APPELLANT, v. DONALD P. LAN, SECRETARY OF STATE OF THE STATE OF NEW JERSEY, JAMES ZAZZALI, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, APPELLANTS AND CROSS-RESPONDENTS.

Argued October 5, 1981—Decided October 6, 1981.
Opinion December 29, 1981.

*Michael R. Clancy*, Deputy Attorney General, argued the cause for appellants and cross-respondents (*James R. Zazzali*, Attorney General of New Jersey, attorney).

*Daryl F. Todd* argued the cause for respondent and cross-appellant (*Previti, Todd & Gemmel*, attorneys).

The opinion of the Court was delivered by

WILENTZ, C. J.

The issue before us is the fairness of a statement that would appear on the ballot explaining a controversial public question.

We decided the case, without issuing an opinion, on an emergent basis on October 6, 1981, five days after receiving the record and briefs. Immediate decision was required in order to allow county clerks time to prepare and distribute ballots sufficiently in advance of election day, November 3, 1981. Further delay (by statute the ballots should have been mailed on October 9, 1981) would have jeopardized the ability of voters to cast absentee ballots. *N.J.S.A.* 19:57–11. We decided that the proposed interpretive statement issued by the Secretary of State was unfair. We suggested, but did not order, an alternative, which was thereafter adopted by the Secretary of State and actually used on the ballot. None of the parties to this litigation objected. This opinion explains our decision.

In June of 1981 the Legislature, pursuant to *N.J.Const.* (1947), Art. IX, par. 1, adopted a proposed constitutional amendment for submission to the voters.[1] The amendment concerns the doctrine that the State is the owner of all lands that have ever been flowed by the tide. The doctrine is, of course, more complicated than just stated, but the statement reveals the difficulty to which the amendment was addressed: the uncertainty of ownership resulting from the fact that it is often exceedingly difficult to determine whether a particular parcel, now dry, was once tidal flowed. The doctrine and the difficulties caused by it are reflected in numerous decisions including, more recently, *Newark v. Natural Resource Council in the Dep't of Environmental Protection*, 82 *N.J.* 530 (1980); *Borough of Wildwood Crest v. Masciarella*, 51 *N.J.* 352 (1968); *Ward Sand & Materials Co. v. Palmer*, 51 *N.J.* 51 (1968); *O'Neill v. State Highway Dep't*, 50 *N.J.* 307 (1967). As those decisions indicate, the State for 11 years, pursuant to *N.J.S.A.* 13:1B–13.1 *et seq.*, has been engaged in a mapping program designed to perfect the State's claims and to provide notice to owners that the State claims title to their lands.

---

[1] The amendment was approved by the voters on election day.

Apparently the delay in asserting State claims to such lands and the consequent impact on the owners' ability to use or sell their land was believed by some to require a remedy. While estimates vary, there is no question that the amount of land potentially subject to such claims is vast—whether the State succeeds or not. The Assistant Commissioner for Natural Resources of the Department of Environmental Protection estimated in hearings preceding the Legislature's action that 235,000 acres might be involved. *Hearings on Assemb. Conc. Res. 3037 before the Subcomm. of the Assemb. Agriculture and Environment Comm.* 15 (1981) (hereinafter cited as "Assembly Hearings").

The remedy adopted by the Legislature, subject to the approval of the voters, was the creation of a 40 year time bar, similar to a statute of limitations. *Sen.Conc.Res.* No. 3023 (1981), *Assemb.Conc.Res.* No. 3037 (1981). The amendment sought to bar all State claims to land not flowed by the tide for the past 40 years. The prior law, by contrast, subjected lands to the State's claim no matter how ancient the tidal flow over that parcel may have been, or put differently, no matter how long the land had been dry. The amendment did, however, give the State one year from the date of its adoption (November 3, 1981) to make claims to lands not flowed by tides during the past 40 years. Thus, no 40–year bar could be asserted against claims made by November 3, 1982, while any claim thereafter asserted by the State would be subject to the bar.

A significant portion of the parcels potentially subject to such State claims have apparently been free of tidal flow for more than 40 years. Therefore, the obvious benefit to landowners, assuming no claim is made against their land during the one-year period, is that their ownership of the land as a practical matter would be perfected.

The amendment *seems* fair to both sides since by its terms it does not take anything away from the State but simply requires the State to act expeditiously. However, there were those,

including the Governor, who deemed it manifestly unfair. In their view, it was a practical impossibility for the State to assert its claims within the one-year period provided in the amendment. The technological complexities of mapping the area subject to State claims have been before this Court on several occasions. *See, e.g., Newark v. Natural Resource Council, supra,* 82 *N.J.* at 535–36. The contention of those involved with such mapping is that a very substantial portion of it could not possibly be completed within the one-year period because of the nature of the task as well as the lack of adequate manpower and resources to accomplish it in so short a time. *Joint Hearings on Sen. Conc. Res. 3023 before the Sen. Judiciary Comm. and Assemb. Judiciary, Law, Public Safety and Defense Comm. 2,* 7–10 (1981) (hereinafter cited as "Joint Hearings"). Proponents of the amendment point to the 11 years of prior mapping efforts as evidence that more than enough time has already been allowed, while mapping technicians cite the same as proof of the enormous difficulties involved and the inadequacy of allowing only one more year to complete the job. *Id.* at 13.

Those opposing the amendment asserted that something more was involved than simply defeating State "claims of ownership" that might otherwise have succeeded. Their view was that the amendment would inevitably have the effect of taking from the State that which it owned and turning it over to private interests, namely, those who were the record owners of the property. *Id.* at 7–9. Emphasizing the historical doctrine of absolute state ownership of lands that were once flowed by the tide, the opponents claimed no other state had ever attempted to give away its land. *Id.* at 8–9, 14–15. From their point of view not only was the one-year period too short, but the 40-year period not long enough. *Id.*

A further objection was raised based on the special relationship between riparian lands and the public school fund. Pursuant to *N.J.Const.* (1947), Art. VIII, § IV, par. 2, and *N.J.S.A.* 18A:56–1 *et seq.*, all riparian lands owned by the State or the proceeds from their sale, as well as the income resulting from

such ownership or proceeds, are irrevocably pledged to a perpet-ual fund for the support of public schools. It was argued that this fund, rather than the general treasury of the State, would be the victim of the proposed amendment. *Assembly Hearings, supra,* at 7–8.

Finally, the supporters and opponents of the amendment probably differed on a more fundamental question, the fairness of the doctrine itself. To those opposing the amendment, it was unfair to take away from the State that which the law said the State owned. To those who supported the amendment it was unfair in the first place ever to have said that simply because the tides flowed over a particular piece of land, the State should be deemed its owner. *Joint Hearings, supra,* at 8–10, 14–15.

The amendment approved for submission to the voters was as follows:

> No lands that were formerly tidal flowed, but which have not been tidal flowed at any time for a period of 40 years, shall be deemed riparian lands, or lands subject to a riparian claim, and the passage of that period shall be a good and sufficient bar to any such claim, unless during that period the State has specifically defined and asserted such a claim pursuant to law. This section shall apply to lands which have not been tidal flowed at any time during the 40 years immediately preceding adoption of this amendment with respect to any claim not specifically defined and asserted by the State within 1 year of the adoption of this amendment.

The form of the public question to be submitted to the voters was, as is customary, also set forth in the legislation, presumably pursuant to *N.J.S.A.* 19:3–6. The question read as follows:

## RIPARIAN LANDS

Do you approve the amendment to Article VIII of the Constitution adding a new Section V and paragraph 1 thereto, requiring that lands shall have been tidal flowed within the last 40 years to be deemed riparian lands subject to State claims, and barring State claims not defined and asserted by law within that period?

Although the applicable statute, *N.J.S.A.* 19:3–6, appears to mandate "a brief statement interpreting" the public question where, as here, it concerns an amendment to the State Constitu-tion, the Legislature made no provision for such interpretive

statement. The statute proposing the amendment simply set forth the amendment itself, the public question, and nothing else. Under those circumstances, *N.J.S.A.* 19:3–6 also provides:

In [the] event that in any statute the public question to be voted upon is so stated as not clearly to set forth the true purpose of the matter being voted upon and no provision is made in said statute for presenting the same in simple language or printing upon the ballots a brief statement interpreting the same, there may be added on the ballots to be used in voting upon the question, a brief statement interpreting the same and setting forth the true purpose of the matter being voted upon in addition to the statement of the public question required by the statute itself.

The Attorney General and Secretary of State concluded that an interpretive statement was needed to inform the voters of the true purpose of the public question and, as permitted by the aforesaid statute, formulated the following statement to be added to the public question:

Land now or formerly flowed by the tide belongs to the people of this State. If these public lands are sold by the State, the monies received are placed in a fund to support public education for all schools in the State. The State has been locating and mapping these lands but the process has not been completed.

Adoption of this amendment would require that the State establish any claims within a one year period to lands not flowed by the tides during the past 40 years or the public's claim to that land would be lost without any compensation whatsoever to the school fund on behalf of public education.

This statement was not the first proposed by the Attorney General's office. Representatives of that office had bitterly fought the adoption of the proposed amendment by the Legislature, had appeared at public hearings voicing their opposition thereto, and had issued several statements to the press setting forth their reasons for their position. Their opposition was intense, and the controversy heated. *See supra* at 5–7; Atlantic City Press, June 26, 1981, at 1, col. 4; Newark Star-Ledger, June 21, 1981, at 15, col. 1; Atlantic City Press, June 6, 1981, at 1, col. 2.

The first statement proposed by the Attorney General but rejected by the Secretary of State, read as follows:

Lands now or formerly flowed by the tides belong to the people of this State. If these public lands are sold by the State, the monies received are placed in a fund to support public education for all schools in the State.

> The State has been locating and mapping these lands and that process would be completed within the next five years. Adoption of this amendment would require that the State establish any claims within a one year period to lands not flowed by the tides during the past 40 years or the public's claim to that land would be lost. Adoption of this amendment would transfer the people's land, valued at an estimated several hundred million dollars, to private owners without any compensation whatsoever to the school fund on behalf of public education.

Thereafter another statement was proposed and similarly rejected. It read as follows:

> Land now or formerly flowed by the tide belongs to the people of this State. If these public lands are sold by the State, the monies received are placed in a fund to support public education for all schools in the State. The State has been locating and mapping these lands but the process has not been completed.
>
> Adoption of this amendment would require that the State establish any claims within a one year period to lands not flowed by the tides during the past 40 years or the public's claim to that land would be lost to private owners without any compensation whatsoever to the school fund on behalf of public education.

Finally, the Attorney General's office drafted the interpretive statement that was ultimately accepted by the Secretary of State, quoted at 33, *supra*.

Plaintiff, William A. Gormley, a member of the General Assembly, promptly brought this action to enjoin the use of the interpretive statement on the ballot. Gormley contended that the statement was argumentative, biased and misleading because it focused on the effects of the proposed amendment rather than its purpose. The Assemblyman further contended the statement constituted electioneering within or about the polling place in contravention of *N.J.S.A.* 19:34–15, which provides:

> If a person shall distribute or display any circular or printed matter or *offer any suggestion or solicit any support for any candidate, party or public question within the polling place* or room ... he shall be guilty of a misdemeanor. [Emphasis supplied].

*See Guernsey v. Allan*, 63 *N.J.Super.* 270 (App.Div.1960).

In the meantime, the Assembly's Judiciary Committee, agreeing with Gormley, adopted a resolution calling for a different interpretive statement, which read as follows:

> This constitutional amendment will limit the amount of time during which the state can exercise ownership over lands that have been previously tidal-flowed.

The amendment would specify that lands which have not been flowed by the tide for the past 40 years would not be deemed riparian lands owned by the state.

Gormley's action was brought before the Appellate Division pursuant to *R.* 2:2–3(a)(2) as an appeal challenging the final decision of the state administrative officer (the Secretary of State). The Appellate Division on an emergent basis held that the proposed interpretive statement was biased and misleading, and enjoined its use. 181 *N.J.Super.* 7 (1981). The court suggested, but did not mandate, the use of the following statement:

> By the terms of this proposed amendment the State would relinquish all its claims, if any, in lands formerly flowed by tidal waters, which have not been so flowed by tidal waters within the last 40 years—unless the State asserts its claims thereto within one year immediately following adoption of this amendment. [*Id.* at 14].

The court ordered the Secretary of State to draft a new interpretive statement and retained jurisdiction in the event of any further objection to such statement. Before it could be prepared, the Attorney General, as counsel for the Secretary of State, filed a notice of petition for certification along with various motions seeking expedited consideration, all of which we granted. We ordered oral argument on October 5, 1981, and decided the matter the next day.[2]

---

[2]We suggested the following statement, which was accepted by the Secretary of State and used on the ballot:

> The primary purpose of this amendment is to relieve owners of land from certain competing claims of ownership by the State. These claims arise from the fact that the State may own any land that ever had the ordinary high tide ("mean" high tide) flow over it, regardless of who the record owner may be or how long he has occupied the land. Sometimes it is difficult to determine that fact and owners may be uncertain for years if the State has a claim to the land.
>
> When the State establishes ownership of tidal flowed land, any proceeds from the sale of the land are deposited in a fund devoted to public education.
>
> This amendment provides that if the State does not, within one year, present all claims on lands that have been "dry" for at least 40 years, those claims are barred. The State may have claims for such land that would succeed under present law but that may be extinguished by virtue of this amendment, if for any reason the State does not assert such claims within that one year.

Plaintiff's position before us is, of course, that the Appellate Division was correct in enjoining the use of the interpretive statement issued by the Secretary of State. He is satisfied with that proposed by the Appellate Division, although in his brief he proposes two alternatives, either of which he would prefer.[3] Gormley also contends that we should prohibit the Attorney General from any further participation in the drafting of an interpretive statement because of his opposition to the amendment and the alleged conflict of interest resulting therefrom.

The Secretary of State, through the Attorney General, contends that the interpretive statement issued by him is accurate and unbiased. The Secretary of State considers the statement suggested by the Appellate Division inadequate, but would be satisfied if the following sentence were added: "Under present law, any monies realized from these claims are assets of the school fund established by Article VIII, § 4, par. 2 of the New Jersey Constitution and used for the support of public education." As a final point, the Secretary asserts that under no circumstances should the Attorney General's office be barred from further participation in drafting any new interpretive statement, if one is required.

The governing statute, *N.J.S.A.* 19:3–6, authorizes an interpretive statement when the Legislature has declined to supply one. While the statute appears to impose that duty mandatorily on the Legislature itself where an amendment to the State

---

[3]Gormley's first version reads as follows:

This Constitutional amendment will limit to one year the amount of time during which the State can assert a claim to ownership over the lands which had been previously tidal flowed. Also, the amendment specifies that lands which have not been flowed by the tide for the past forty years would not be deemed riparian lands owned by the State.

In the alternative, Gormley proposes the following:

A "yes" vote supports limiting the definition of riparian land by requiring that the State establish any claims during a one year period to State riparian lands not flowed by the tides during the past forty years. A "no" vote supports the present definition of riparian land which allows the State to bring a claim for such land without time restriction.

Constitution is involved, it is understandable that the Legislature might prefer to leave that task to others. Interpretive statements can be drafted in an infinite variety of ways, and the Legislature may simply have determined that arriving at an acceptable draft was not worth the legislative energy. Where no such statement is provided by the Legislature *and* where the public question does not "clearly . . . set forth the true purpose of the matter being voted upon," the statute authorizes the addition of "a brief statement interpreting the same and setting forth the true purpose of the matter being voted upon." No one disagrees that the circumstances here called for the addition of an interpretive statement, for certainly the public question itself does not tell the ordinary voter what is involved. A proper concern for protecting the ballot requires that the voters be informed as to the choices being made. *See Great Northern R. Co. v. Flaten*, 225 *N.W.2d* 75, 78 (N.D.Sup.Ct.1974).

We do not believe it would be particularly useful to try to formulate a specific standard against which all interpretive statements of this kind could be measured. Using the words of the statute, the statement should serve the function of "interpreting" the public question and "setting forth the true purpose" of same. Obviously there can be substantial dispute as to what the true purpose of an amendment is; indeed there may be many "true purposes." As for the standard to test the adequacy of the "brief statement" in "interpreting" the question, the statute provides no specific guidance, nor are we capable of devising any. The spirit of the statute, however, is simple and clear: the brief statement is to be added to help the voter understand more about the amendment than the public question tells him, for the purpose of aiding him in his decision. To the extent possible within the limits of "a brief statement," it should try to get to the heart of the matter as understood by those who are knowledgeable about it. In some cases, as in this, the statement of "true purpose" may best be achieved by attempting to state the consequences of both adoption and rejection of the proposed amendment. In other cases some other formula-

tion or standard may better achieve the legislative purpose, namely, supplying the voter with additional important information to help him cast his vote. In some cases it may be simply impossible to get to the heart of the matter with a brief statement.

There is another requirement that the brief statement must satisfy. It must be fair. Although there is no statutory provision to that effect, courts have so ruled in similar contexts, *Guernsey v. Allan*, 63 *N.J.Super.* 270, 275 (App.Div.1960); *Young v. Byrne*, 144 *N.J.Super.* 10, 19 (Law Div.1976); and we have no hesitancy in doing the same here. *See also Great Northern R. Co. v. Flaten, supra*, 225 *N.W.*2d at 78–79; *Smith v. Calhoun Comm. Unit School Dist. No. 40*, 16 *Ill.*2d 328, 157 *N.E.*2d 59, 63 (Sup.Ct.1959); 26 *Am.Jur.*2d, *Elections*, § 221 at 51. None of the parties disputes the fact that the Legislature never intended an interpretive statement that was biased.

The case before us presents two problems—whether the Secretary of State's interpretive statement is biased and whether the Appellate Division's suggested statement is sufficiently meaningful.

██ In evaluating the statement drafted by the Attorney General and issued by the Secretary of State we should accord great deference to their determination not only on the basis of settled principles of law, but also because of the glaring inappropriateness of judicial management and supervision of such matters. When within the scope of legislatively-delegated authority, administrative agents' actions are presumptively valid, and where that authority confers discretion upon those agents, their actions will ordinarily not be overturned by the courts unless they are manifestly corrupt, arbitrary or misleading. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562–63 (1978); *Young v. Byrne, supra*, 144 *N.J.Super.* at 19. We can conceive of few cases where administrative officials' discretion is of necessity broader than here, given the enormous variety of statements that could properly be drafted within the

authority vested in those officials. This being the case, the deference accorded the Secretary of State and Attorney General must obviously be even greater than is generally the case. Finally, we have traditionally shown special deference to administrative agents charged with implementing the election laws. *Quaremba v. Allan,* 67 *N.J.* 1 (1975); *Farrington v. Falcey,* 96 *N.J.Super.* 409 (App.Div.1967); *Millman v. Kelly,* 171 *N.J.Super.* 589 (Law Div.1979).

The other basis for yielding to the judgment of the administrative officers here is the inappropriateness of judicial involvement. Public questions often have substantial political overtones. As here, the drafting of an interpretive statement, as well as the question itself, can pit party against party, the Executive against the Legislature, and region against region. The appearance of impartiality is as important to judicial effectiveness and legitimacy as impartiality itself, and in these matters it will often be impossible to appear impartial. Rare is the case where the inadequacy of the interpretive statement will justify the risk of judicial intervention. That risk inheres not simply in the proposal of an alternative but as well in the mere enjoining of the use of the proposed statement. Either can readily be perceived by one side or the other as both prejudicial to their cause and partial to that of their adversary.

This is one of those rare cases. The interpretive statement itself, especially when considered in light of its history, is clearly unbalanced. It reflects only the adverse consequences of an affirmative vote. While substantially accurate, it is the accuracy of an advocate. In failing even to mention any reason supporting the amendment, it is biased.

Had the Secretary of State issued the interpretive statement proposed by the Appellate Division, we would not have intervened. The deference to be accorded the administrative determination would clearly prevail over any shortcomings of that court's formulation of a proposed interpretive statement. We are not, however, constrained to accord deference to the Appel-

late Division's suggested formulation and have therefore examined it on its own merits. While the Appellate Division's proposed statement is free of any taint of bias, we think it could properly have referred to the consequential effects of the adoption of the amendment.

The Appellate Division took the position that the "brief statement" should not be concerned with the consequences of either adoption or rejection, but should simply be designed to explain the question. 181 *N.J.Super.* at 13. This is the result of what we believe is an incorrect understanding of the purpose of *N.J.S.A.* 19:3–6. We do not believe that an interpretive statement in this case can get close to the heart of the matter without referring to consequences. The Appellate Division statement, in our opinion, could have been expanded to advance the voter's understanding of the matter and to help the voter decide the question. .

Likewise, we do not believe that the addition of the sentence proposed by the Attorney General would be sufficient. While the additional sentence would provide more meaningful information, it would again tilt the balance since the entire statement would then refer only to the adverse consequences of adoption of the amendment to the State, without referring at all to the adverse consequences of a negative vote to property owners.

The issue most strongly contested by the parties was whether the effect of adoption of the amendment on the school fund should be mentioned in the interpretive statement. As noted above the Attorney General, while he preferred the interpretive statement issued by the Secretary of State, would have been satisfied with the Appellate Division's formulation if a sentence were added referring to the potential school fund loss. Conversely, the formulations by both the Assembly Judiciary Committee and those suggested in the brief of plaintiff, Gormley, make no reference to the school fund. The critical difference between the parties is best reflected in the Appellate Division's

point of view that the loss to the school fund is really irrelevant, signifying presumably that it does not matter whether the loss be to the general treasury or to the school fund. 181 *N.J.Super.* at 13.

There is an obvious appeal sought to be achieved by the opponents of the amendment by referring to a loss to a fund perpetually dedicated to the support of public schools. We believe there is an underlying legitimacy in advising voters of the ultimate destination of these monies, and of their perpetual dedication.[4] It is quite possible, as the Attorney General obviously believes, that a voter would be more concerned about a loss to a fund dedicated to public school uses than a loss to the general treasury. This concern could be based on the voter's preference of governmental support of education as compared to other governmental purposes, concern about possible increases in property taxes, or in his lack of faith or understanding of the benefits involved in adding to the general treasury.

Based on the foregoing, we affirmed the Appellate Division's judgment enjoining the use of the interpretive statement proposed by the Secretary of State. The question remained, however, as to the appropriateness of suggesting our own. We could have simply disapproved of the Appellate Division's statement and left the Attorney General and Secretary of State free to draft another. Given the time constraints involved and the intensity of disagreement between the parties, it seemed highly probable that such further statement would result in further litigation and, perhaps, delay in printing and distribution of ballots with the consequent potential disenfranchisement of absentee voters. We thought it likely that a statement proposed by this Court would settle the matter, but that the mandating of such a statement would, for reasons set forth above, be inappro-

---

[4]We do not mean to imply any decision concerning the power of the Legislature to alter this arrangement. *But see O'Neill v. State Highway Dep't, supra,* 50 *N.J.* at 321; *N.J.S.A.* 18A:56–5, *L.*1980, *c.* 72.

priate. As indicated at the outset of this opinion, our suggested statement was used and no further litigation ensued.

We have decided upon a statement that includes reference to the school fund but only in the context of an equally specific reference to the "true purpose" of the amendment, namely, resolving the uncertainties of title caused by the riparian land doctrine. The statement composed by the Court was designed to help the voter make his choice by providing more information about the matter. It consists of a brief explanation of the issues and a statement implying the consequences of both adoption and rejection. It cannot be defended as a matter of logic, nor should it be attacked on that basis. It is simply an attempt to conform to the legislative intent of compressing within very little space a fair, balanced statement that will explain a rather complex issue. It could be done in an infinite number of ways with equal, or perhaps more, effectiveness. It is as much a matter of art and spirit as of logic and intellect. While it indeed affects an important constitutional question put to the voter, the composition of the brief interpretive statement itself does not, it seems to us, rise to the same level as those matters that this Court decides in interpreting the Constitution.

Our dissenting colleague believes that the statement could have been improved by the addition of the following sentence: "If State claims are barred under the proposed amendment, the proceeds from the sale of such lands will not be available for said [school] fund." 88 *N.J.* at 47. Our perception is that the addition of such sentence would again tilt the entire statement somewhat in favor of a negative vote. Again it is a matter of judgment on a question where no hours of logical analysis will provide the answer. He thinks his is better, we think ours is. It is not the kind of matter where we can confidently say that he is wrong. However, we are confident that the difference between us is not one of constitutional dimension at all, but rather a difference as to what constitutes a fair and balanced presentation of the question—an issue that will forever separate advocates, jurists and all fair-minded people.

■ We disagree with plaintiff's contention that the Attorney General should be barred from further participation in this matter because of the position he has taken against the amendment and the alleged conflict of interest that has resulted therefrom. Without attempting to define the outer limits of the power of the Attorney General, it is clear to us that it is perfectly appropriate for the holder of that office to take positions on matters of public importance such as the one involved in this referendum. Whether or not it is wise to do so in particular instances is a matter to be decided by the Attorney General alone. The Attorney General is authorized to "inform the voters of the effect" of a constitutional amendment upon other constitutional provisions. *N.J.S.A.* 19:14–31, 19:14–29. In addition, the Attorney General has broad responsibilities to evaluate matters of public policy and to take action he deems necessary to preserve the public good. *Evans-Aristocrat Industries, Inc. v. Newark*, 75 *N.J.* 84, 95 (1977); *Hyland v. Kirkman*, 157 *N.J.Super.* 565, 577 (Ch.Div.1978).

■ Absent unusual circumstances, the adoption of any such position by the Attorney General should not have the effect of barring him from the role of counsel to the various departments and agencies of State government, *see N.J.S.A.* 52:17A–4(e), even though his publicly-stated position may cast some doubt on his ability to render independent advice on the matter. The office of Attorney General is a complex one that encompasses many functions. We should not limit those functions, the product of centuries of experience, constitutional intendment, and legislative will, by imposing strictures that may be entirely appropriate where private counsel is involved. When it comes to the Attorney General, barring unusual circumstances, the faithful discharge of his duties will depend not on finely-tuned rules concerning conflicts of interest but rather on the integrity of the occupant of the office. The wide scope of functions invested in that office and thought to be advantageous to the public necessarily entails some risk of conflict. Absent unusual circumstances, however, this Court should not attempt to elimi-

nate that conflict at the cost of diminishing the public advantage thought to inhere in the broad range of functions committed to that office.

It seems entirely possible that the dispute that looms so large to the adversaries is in reality of little consequence. We doubt very much if many voters decide a public question primarily on the content of the interpretive statement annexed to it. We also entertain substantial doubts as to the number of voters who ever read it. The field of battle is and should be the place where ideas and arguments are commonly exchanged and countered—the press, the other media, the public forum, the grocery store, the street corner, and the home. To whatever extent it is influential, however, the interpretive statement must have substantive content and be fair. We have attempted to achieve that result.

■ Although not before us for decision, we suggest for the future guidance of the Legislature, the Secretary of State and the Attorney General, that the discretion of which we spoke before is vested not in the Secretary of State, but in the Attorney General. It is a discretion to determine whether an interpretive statement should be added to the ballot under *N.J.S.A.* 19:3–6, as well as the content of the statement itself.

Cognate statutes in *L.*1930, *c.* 187, the act that is the source for *N.J.S.A.* 19:3–6, deal with the preparation of referendum information to be distributed with sample ballots (*N.J.S.A.* 19:14–27 through 32). Where the referendum concerns a constitutional amendment, the Attorney General is specifically required to inform the Secretary of State what portions of the State Constitution should be printed and mailed to voters to help them understand "the relation of the amendment submitted to the existing constitution." *N.J.S.A.* 19:14–29, 30. In addition, the statute authorizes the Attorney General to make a summary statement in order to inform the voters of the effect that adoption or rejection of the question will have on statute law or the State Constitution. *N.J.S.A.* 19:14–31.

While the absence of such explicit reference to the Attorney General in *N.J.S.A.* 19:3–6 might be construed to evince an intent to vest the authority under that section elsewhere, we believe the correct interpretation is that the sample ballot provisions reflect a pattern of legislative intent that should be followed in interpreting *N.J.S.A.* 19:3–6.

The sample ballot portions of the 1930 law give the Attorney General the discretion both to determine whether. or not any summary statement should be issued as well as to compose that statement. *N.J.S.A.* 19:14–31. We see no reason why the Legislature would have intended a different procedure in the case of the brief interpretive statement provided for in *N.J.S.A.* 19:3–6. In many cases the Attorney General will be better trained than the Secretary of State in these matters. This kind of task is more appropriate for the Attorney General to perform, especially in view of his unique role as "sole legal advisor" to the Executive branch, which includes a duty to "interpret all statutes and legal documents" such as the ballot question in issue here. *N.J.S.A.* 52:17A–4(e). The statement of the Assembly Judiciary Committee is, of course, helpful in determining legislative intent. We do not believe, however, that the Legislature in passing *N.J.S.A.* 19:3–6 intended to authorize one of its committees to provide a conclusive interpretive statement when the Legislature itself declined to do so.

For the reasons set forth herein we affirm the judgment of the Appellate Division.

HANDLER, J., concurring and dissenting.

This case concerns the appropriate message to be conveyed in an interpretive statement accompanying a proposed State constitutional amendment affecting riparian lands which appeared on the ballot in the November general election. I subscribe generally to this Court's resolution of the matter. My point of difference with the Court is narrow but important. I believe the Attorney General had every right to make a more explicit

reference in the interpretive statement to the effect of the amendment upon the public school fund.[1]

The responsibility for fashioning an interpretive statement belongs to the officials charged by statute with that duty. That task properly reposes in the Attorney General and Secretary of State.[2] Their formulation of the interpretive statement is entitled to considerable deference. The Court now recognizes this. The greater the statutory and administrative responsibility that is vested in the executive or legislative agents over election matters, the more constricted is the jurisdiction of the courts. Judicial and executive responsibilities in election matters stand, as it were, in inverse proportion to one another. See *Quaremba v. Allan*, 67 *N.J.* 1 (1975). Our primary concern is to assure that the ballot not be confusing or deceptive. *Young v. Byrne*, 144 *N.J.Super.* 10, 19 (Law Div.1976). Therefore, unless the interpretive statement is misleading or biased, it should not be disturbed by the courts. *Cf. Quaremba v. Allan, supra; Farrington v. Falcey*, 96 *N.J.Super.* 409 (App.Div.1967); *Millman v. Kelly*, 171 *N.J.Super.* 589 (Law Div.1979); *Edelstein v. Ferrell*, 120 *N.J.Super.* 583 (Law Div.1972) (all recognizing the broad discretion to be accorded election officials in performing their duties).

---

[1]Monies now raised through the sale or lease of riparian lands are dedicated to the fund for public school education, a perpetual fund protected by the New Jersey Constitution and statute law. *N.J.Const.* (1947), Art. VIII, § 4; *N.J.S.A.* 18A:56–1 *et seq.* The amendment, which was adopted, will result in a substantive change of Art. VIII of the Constitution dealing with the subject of State taxation and finance.

[2]State statutes authorize the Attorney General "to inform the voters of the effects" which a constitutional amendment will have upon other constitutional and statutory provisions dealing with the essential subject, *N.J.S.A.* 19:14–31, and to foster voter awareness of the interrelationship between the amendment and existing law, *N.J.S.A.* 19:14–29. This authority is consistent with his overall responsibility to act in the public interest. *Cf. Evans-Aristocrat Industries, Inc. v. Newark*, 75 *N.J.* 84, 95 (1977) (Attorney General has a role for "the protection of public rights").

It is not the business of this Court to act as a ballot scrivener or to try its hand in the craftsmanship of such a sensitive, controversial and delicate matter as an interpretive statement concerning a proposed amendment to our State Constitution. We did so in this case only because of the emergent need to resolve the controversy. Hence, the interpretive statement in the Court's order was at most a "suggestion" for the guidance of the responsible parties. While it contains the components of what this Court believes would be a statement fulfilling the objectives of the law, taking into account the legitimate, albeit somewhat partisan, views of the litigants, the ultimate crafting of such a statement remains securely within the discretionary authority of the Attorney General and the Secretary of State.[3]

The Attorney General in this matter sought to refer to the effects of the amendment upon public school funding because of its obvious importance to the public generally. In my estimation, he was empowered to consider this constitutional consequence, to ascribe significance to it and to refer to it in the interpretive statement in order to enlighten the electorate to the greatest extent possible within the inevitable constraints of time, space and language imposed by the election laws. I would therefore give great weight to the Attorney General's intentions in this regard as a reasonable exercise of discretion and permit inclusion in the suggested interpretive statement of a more explicit reference to the amendment's consequences upon public education funding. By failing to include such a reference in the majority's precatory statement, the Court has, I fear, given its imprimatur to its exclusion. Hence, where the majority's statement referred to the relationship between riparian land sales and public education, I would have added to that paragraph the following sentence:

If State claims are barred under the proposed amendment, the proceeds from the sale of such lands will not be available for said fund.

---

[3] In this instance the suggested interpretive statement set forth in the Court's order of October 6, 1981 was adopted verbatim and certified by the Secretary of State for use on the ballot.

This addition would constitute a balanced presentation of the proposal and would underscore the Attorney General's proper role in fashioning interpretive statements under our election laws.

To this extent, I dissent from the opinion of the Court.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER and POLLOCK—5.

*Concurring in part, dissenting in part*—Justice HANDLER—1.