187 N.J. Super. 224 (1982)
454 A.2d 491
FAIRLEIGH S. DICKINSON, JR., ET AL., PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS,
v.
THE FUND FOR THE SUPPORT OF FREE PUBLIC SCHOOLS, ET AL., DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued August 30, 1982.
Decided October 22, 1982.
*226 Before Judges MATTHEWS, MICHELS and MORTON I. GREENBERG.
William Harla, Deputy Attorney General, argued the cause for appellants and cross-respondents (Irwin I. Kimmelman, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel).
*227 E. Carter Corriston, argued the cause for respondents and cross-appellants (Breslin & Breslin, attorneys; Brian T. Campion, on the brief).
John R. Weigel, argued the cause for amicus curiae New Jersey Land Title Association (Joseph M. Clayton, Jr., on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, J.A.D.
This opinion records another episode in the ongoing and seemingly endless controversy concerning ownership of lands in New Jersey claimed by the State as tidelands. See, e.g., Wildwood Crest v. Masciarella, 51 N.J. 352 (1968); O'Neill v. State Hwy. Dep't, 50 N.J. 307 (1967); Garrett v. State, 118 N.J. Super. 594 (App.Div. 1972). An understanding of this litigation requires that the background of the problem be set forth at length.

History
In England the sovereign owned the tidelands. See Schultz v. Wilson, 44 N.J. Super. 591, 596-599 (App.Div.), certif. den. 24 N.J. 546 (1957); River Developm. Co. v. Liberty Corp., 51 N.J. Super. 447, 460 (App.Div. 1958), aff'd 29 N.J. 239 (1959). This ownership included the lands up to the mean high tide. See O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 323. Not surprisingly, this sovereign ownership was recognized to exist in New Jersey when it was a colony. See Schultz v. Wilson, supra, 44 N.J. Super. at 596-599. Accordingly, at the time of the American Revolution title to the tidelands became vested in the State as successor to the English sovereign. O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 322-323; Schultz v. Wilson, supra, 44 N.J. Super. 596-599.
During its first two centuries our State Government made no effort on a state-wide basis to catalog or itemize all of the tidelands claimed by the State. See O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 320. In the absence of a clear delineation of the State's claim, private persons developed lands which arguably *228 were state-owned. In many instances there can be no doubt but that these persons were acting in good faith since it was a difficult process to ascertain the line of mean high tide separating public and private ownership. See O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 327. In such circumstances, if the property developed had in fact been tidal, the State was de facto deprived of its lands, its loss being attributable in part to its neglect in asserting its claim. In other cases properties, though once tidal, by reason of gradual accretion lawfully became privately owned and were then developed. See Wildwood Crest v. Masciarella, supra, 51 N.J. at 352. In yet other situations properties that were close to but above the mean high water line and never had been below that line, were filled and developed. The State could have no valid claim to properties in the second and third categories. But the State would, unless barred by grant or on some other basis, have a claim to properties in the first category. The difficulty in distinguishing among the types of lands after they were filled, coupled with the absence of mapping of the State's claims, guaranteed that there would be doubt as to the ownership of particular parcels.
As might be expected, properties in all three categories were sold and conveyed and reconveyed. A purchaser, after several conveyances following the original improvement of the property, would have a difficult time in ascertaining whether the State could assert a legitimate claim to his property. See Gormley v. Lan, 88 N.J. 26, 29 (1981).
The Supreme Court recognized the difficulty caused by these title uncertainties in O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 307. The court, though declining generally to bar the State's claim to tidelands on principles of estoppel, adverse possession or prescription, noted that for the most part people dealing with the tidelands had acted in good faith. 50 N.J. at 327. Hence the court directed that the burden of proof in tidelands title disputes would be on the person attacking the existing scene. Ibid. Since ordinarily private persons do not suggest (absent a riparian grant from the State) that tide-flowed property is *229 privately owned,[1] this principle assigning the burden of proof ameliorated the strictness of the rules declining to apply estoppel, adverse possession or prescription against the State. In short, the State was ordinarily given unlimited time to make its claim but it was burdened with the obligation to prove it. Further, the court, in an effort to bring order out of chaos, made a suggestion to the Legislature that the State catalog its property. 50 N.J. at 320.
The legislative response to the court's suggestion was prompt. By L. 1968, c. 404, the then Resource Development Council of the Department of Conservation and Economic Development was directed "to undertake title studies and surveys of meadowlands throughout the State and to determine and certify those lands which it finds are State-owned lands." N.J.S.A. 13:1B-13.2. The initial survey, which was to be completed within six months, was to be of the Hackensack meadowlands. Ibid. No doubt this was a reflection of the economic significance of that property. Indeed, O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 307, was a Hackensack meadowlands case. The Legislature was overly optimistic as to the time in which the surveys could be completed. The Hackensack meadows were not properly surveyed within the six months period. Nor was the balance of the State surveyed by December 31, 1974, the time the Legislature contemplated in 1968. See L. 1968, c. 404, § 92. Indeed, the State has to this day not been completely surveyed.
Two other aspects of the 1968 act are also significant for our purposes. As noted, the Council was to study and survey "meadowlands" throughout the State. Meadowlands were defined as being lands "now or formerly consisting chiefly of salt water swamps, meadows or marshes." L. 1968, c. 404, § 87; *230 N.J.S.A. 13:1B-13.1. Thus, by its terms the Council was not directed to survey property such as unlawful stream encroachments. But we have no doubt but that this restrictive terminology is simply a reflection that the Legislature's attention was directed to the Hackensack region. Indeed, the principal purpose of the statute was to create the Hackensack Meadowlands Development Commission. L. 1968, c. 404, § 5. There the title disputes to a large degree did involve meadowlands. In any event, the Resource Development Council and its successor agencies, first the Natural Resource Council (N.J.S.A. 13:1D-3), and now the Tidelands Resource Council (L. 1979, c. 386, § 1), have construed L. 1968, c. 404, as authorizing mapping of all State tidelands. We accept this practical administrative interpretation. See Malone v. Fender, 80 N.J. 129, 137 (1979).
Secondly the statute does not expressly indicate the consequence of the classification of a property as State-owned or not. There can be no question, of course, that the State could not, simply by claiming the property, deprive a rightful owner of his title. Indeed, the Legislature contemplated no such thing. Rather, it established mechanisms for a claimant to challenge the State's claim of title. N.J.S.A. 13:1B-13.5.
A more difficult question is whether the Legislature intended that lands not claimed by the mapping under L. 1968, c. 404, be free from any future state claim. It is well known that the proceeds of the sale of riparian grants are and have been dedicated to the Fund for the Support of Free Public Schools. See Gormley v. Lan, supra, 88 N.J. at 31; River Development Corp. v. Liberty Corp., supra, 51 N.J. Super. at 475. Thus, the State cannot make a gift of such lands, even to a municipality. See Garrett v. State, supra, 118 N.J. Super. at 599; In re Camden, 1 N.J. Misc. 623, 639-641 (Sup.Ct. 1923); Henderson v. Atlantic City, 64 N.J. Eq. 583 (Ch. 1903). While we note this point, we find it unnecessary to decide in this case. Therefore, it might be asserted that even if the State does not make a *231 claim to lands on a map made pursuant to L. 1968, c. 404, a subsequent claim is not barred.[2]
Finally, it is important to note that the Legislature intended to give a landowner no relief other than finding out the status of his property. The landowner would know if the State claimed it. And he could challenge the decision administratively or judicially. Beyond that his only recourse was to obtain a grant. N.J.S.A. 13:1B-13.7. There was no amnesty in the act for owners of properties unlawfully filled.
The initial mapping techniques used pursuant to L. 1968, c. 404, were inadequate. The original map of the Hackensack meadowlands, "Block and Lot Subdivision in the Hackensack Meadows, Part I and Part II," called the "gray and white map," became implicated in litigation entitled "State of New Jersey by the Commissioner of Transportation vs. The Council in the Division of Resource Development of the Department of Conservation and Economic Development of the State of New Jersey," L-12561-68. Judge Trautwein, on September 8, 1971, in that action held that the map had not been properly prepared. See Newark v. Natural Resource Council, 82 N.J. 530, 533 (1980), cert. den. 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980). He ordered that the map not be received into evidence to prove ownership of the State and that to the extent the map purported to prove or establish ownership it was suppressed.
Fortunately, this failure was replaced by success. The State developed sophisticated mapping techniques which, after several years of litigation, were approved by the Supreme Court in Newark v. Natural Resource Council, supra, 82 N.J. at 530. Of course, approval of the method of mapping did not mean that the state claim as to any property was valid. 82 N.J. at 542. *232 Obviously, the State could make no such binding finding in an ex parte administrative determination.

Passage of the Amendment
The approval of the State's methods in Newark v. Natural Resource Council, supra, 82 N.J. at 530, gave the necessary legal foundation for the State to complete the mapping it was undertaking. Indeed, the Commissioner of Environmental Protection had already approved a program to complete the mapping. But it also meant that large numbers of landowners might find themselves confronted with an official claim to their properties, surely a most disquieting situation. The problem for these landowners was aggravated by the fact that the mapping had been judicially approved. It was against this background that the Legislature adopted a resolution submitting to the people for their approval or not on November 3, 1981 a constitutional amendment, now N.J. Const. (1947), Art. VIII, § V, par. 1, (hereinafter called "amendment"), providing as follows:
No lands that were formerly tidal flowed, but which have not been tidal flowed at any time for a period of 40 years, shall be deemed riparian lands, or lands subject to a riparian claim, and the passage of that period shall be a good and sufficient bar to any such claim, unless during that period the State has specifically defined and asserted such a claim pursuant to law. This section shall apply to lands which have not been tidal flowed at any time during the 40 years immediately preceding adoption of this amendment with respect to any claim not specifically defined and asserted by the State within 1 year of the adoption of this amendment.
The Legislature perceived that the results contemplated in the amendment could be achieved only by constitutional amendment since the proceeds from the sale of the riparian lands have been long dedicated constitutionally to the public schools. See N.J. Const. (1844), Art. IV, § VII, par. 6; N.J. Const. (1947), Art. VIII, § IV, par. 2; L. 1894, c. 71; N.J.S.A. 18A:56-5. The effect of the amendment is quite limited. It simply provides that lands which have not been tide-flowed for 40 years shall not be riparian and State-owned unless within the 40-year period the State "has specifically defined and asserted a claim pursuant to law." With respect to lands that were not tide-flowed for 40 *233 years immediately before the adoption of the amendment, the State was given an additional one year after the adoption of the amendment to assert its claim.
The record before us shows that there was heated public debate with respect to the amendment. Some persons characterized it as a give-away. The state administration then in office vigorously opposed it. Yet other persons considered it just that the State be compelled to make its claim expeditiously. The proposal generated two legal actions before the election. In Gormley v. Lan, 181 N.J. Super. 7 (App.Div. 1981), this court held that the interpretative statement prepared by the Attorney General to be printed on the ballot was unfair. We suggested a different statement. Our decision was immediately appealed to the Supreme Court. That court affirmed our decision precluding the use of the original statement. The Supreme Court, however, suggested a different statement. Its statement was adopted by the Secretary of State and used on the ballot. 88 N.J. 26 (1981).
The second action is the one now before this court. Plaintiffs sought an injunction barring the referendum on the amendment. Plaintiffs' application for a preliminary injunction was denied. The election then went forward on November 3, 1981 and the amendment was approved by a vote of 864,445 yes and 756,220 no.
Following the election plaintiffs amended their complaint. Plaintiffs in the amended complaint include New Jersey residents, taxpayers and landowners, a New Jersey public school teacher, a New Jersey public school student, a purchaser of riparian lands from the State and the owner of a school bond issued by a New Jersey school district. Defendants are various state officers, including the trustees of the Fund for the Support of Free Public Schools and the Tidelands Resource Council. The first count of the amended complaint alleged that the amendment was invalid because it sought to convey without compensation state land which had been irrevocably dedicated as trust *234 property for the Fund for the Support of Free Public Schools. The second count alleged that the amendment will unlawfully deprive the trustees and beneficiaries of their property without due process and just compensation through the process of eminent domain exercised for private purposes. The third count recited that the State would only be able to map a portion of its claim and thus would be able to assert only part of the state claim within a one-year period after the adoption of the amendment on November 3, 1981. Thus, it was set forth that there would be an unconstitutional discrimination between owners of property that will be or will not be mapped. The fourth count of the complaint requested that the court order the Tidelands Resource Council expeditiously to map and approve maps of the riparian lands prior to November 3, 1982.
The fifth count of the complaint was rather complicated. It alleged that all riparian lands are dedicated to the support of the public schools so that the proceeds from the sale of such lands are dedicated to the school fund. It set forth that in 1980 the New Jersey School Bond Reserve Act, L. 1980, c. 72, N.J.S.A. 18A:56-17, was adopted. The purpose of this act was to improve the credit ratings of New Jersey school districts by pledging a portion of the assets of the school fund to secure the payment of principal and interest on bonds issued for school purposes. It was alleged that purchasers of school bonds issued since 1980 have relied upon the pledged security from the proceeds of sale of riparian lands. Finally, it was set forth that the amendment would impair the bondholders' right of contract since their security would be impaired without their consent and without the consent of the trustees of the school fund.
Defendants duly answered. In general, they denied that there was anything unlawful or unconstitutional in the amendment.
A trial was conducted by Judge Simpson in the Law Division sitting without a jury. Many of the facts were stipulated and various exhibits were marked into evidence by consent. In *235 addition, oral testimony was taken. Plaintiffs called as their witness Roland S. Yunghans, Chief of the Office of Environmental Protection, Office of Environmental Analysis. Yunghans had become involved in the mapping pursuant to L. 1968, c. 404, after Judge Trautwein suppressed the gray and white map. Yunghans was charged with devising and implementing a new method of mapping. He studied various methods of mapping; ultimately he settled on what he characterized as a "hybrid" method which included consideration of surveying, aerial photography, old maps and tidal datum. The first area mapped was the Hackensack meadowlands. In August 1978 Yunghans submitted five different plans to the Commissioner of Environmental Protection to map the rest of the State. The plan adopted contemplated that mapping would start January 1, 1979. The projected cost and completion date were respectively $12,500,000 and December 31, 1985.
Yunghans and his staff utilized a map of the State which placed all possible tidal areas into squares of 1.5025 square miles. This map was designated at the trial as P-13. There are 1,632 squares shown on the map. This constitutes 2,452 square miles, or about 30% of the total land area in the State. Yunghans estimated that about 215,000 to 300,000 acres within the squares could be claimed by the State. Most of that acreage is on the Atlantic coast. About one-half of the amount of acreage that could be claimed on the Atlantic coast could be claimed in the Delaware River region. Yunghans also explained in detail how the maps are processed and approved by the Tidelands Resource Council. He indicated that as of the time of the trial he had completed and submitted to the Council only about half of the 1,632 maps to be prepared. He said that almost the entire Atlantic coast region would be mapped by November 3, 1982. This would constitute about 53% of the land within the 1,632 squares. Yunghans testified that it would take until December 31, 1985 to complete the mapping of the rest of the State. He explained that the process could not be accelerated. He also *236 indicated that notwithstanding the adoption of the amendment the mapping will continue.
David Moore, chairman of the Tidelands Resource Council since 1971[3] testified that the map approval process is complicated and time-consuming. He considered that the method followed by the Council, prior to the new "hybrid" program described by Yunghans, to assert and define claims to riparian land had been a "haphazard process." He also explained the extraordinarily involved procedure for conveyance of riparian lands. He indicated that an application for a grant is reviewed by the staff in the Department of Environmental Protection. He stated: "The review process, first of all, will determine whether or not an alienation would be in the public interest, whether or not it meets environmental standards and whether or not the compensation that has been suggested by appraisal is adequate." He pointed out that if the council will not agree to a conveyance, then no funds from the sale of the property go to the school fund. He also indicated that more often than not it is not in the public interest to convey riparian property and thus no grant is made.
Moore was questioned by the trial judge as to the possibility of adopting P-13 as the State's claim in areas where the detailed maps had not been prepared. Moore indicated that even though the State would lose some property along the Delaware, the Council felt that it would not be a responsible act to file P-13 as the State's claim. He later explained when questioned by the deputy attorney general that there were a number of reasons for this view, not the least of which was that the council "feels a responsibility not to claim land that it has knowledge that the State has no interest in. We know as a result of the mapping process that's gone on that there are likely to be significant areas of land to which the State has no claim involved in the P-13 exhibit along the Delaware." He also pointed out that the *237 Council would be swamped with information disputing the claims. See N.J.S.A. 13:1B-13.5.
Three financial experts were produced as witnesses in this case, two by plaintiffs and one by defendants. Stanislaw Wellisz, a professor of economics at Columbia University, testified for plaintiffs that the school age population in New Jersey would decline until 1985 but would rapidly increase thereafter. Thus, more school bonds would have to be issued to finance capital improvements.
Plaintiffs also called Charles Wolf, a professor in the Columbia University finance department. He testified as to the effect of the amendment on school bonds, particularly those issued after the Legislature adopted the New Jersey School Bond Reserve Act, N.J.S.A. 18A:56-16 et seq., in 1980. Wolf said that after the establishment of the reserve fund in July 1980 one of the two major bond rating services, Standard and Poor's, upgraded the ratings it had issued 47 school districts in New Jersey. These ratings influence the interest rate that the school district will be compelled to pay the purchasers of its bonds. The higher the rating the lower the rate of interest. Wolf gave an example of a school district with bonds outstanding. Upon the reclassification of its bonds it appeared that the holder of them was able to resell them to yield a lower interest rate. Thus he apparently received a higher sale price. Presumably, had the school district itself been selling bonds it could have obtained an initially lower rate. Wolf attributed the improvement in the rate to the fact that the rating service recognized that the school fund was being enhanced by the aggressive action of the State to recover compensation for its lands.
Wolf expressed concern that the amendment might affect Standard and Poor's ratings. He acknowledged that the ratings had not been changed upon the adoption of the amendment, but thought they might be changed when the service obtained additional information. He also thought that a potential investor's perception of the bonds could be affected by the amendment.
*238 Richard Stoddard, a former director of the Division of Investment of the New Jersey Department of the Treasury, submitted an affidavit on behalf of defendants that was admitted into evidence by consent. He indicated that the School Bond Reserve Act was adopted in part to convince Standard and Poor's of the soundness of school bonds as an investment. He considered that the enhanced rating stemmed from the commitment of existing reserves to secure the bonds. In Stoddard's view, the potential sale of unknown holdings in riparian land had virtually no consequence in the ratings.
Judge Simpson decided the case in a written opinion filed July 8, 1982. See Dickinson v. Fund for the Support of Free Public Schools, 83 N.J. Super. 21 (Docket No. L-6793-81). He found that following suppression of the gray and white map the State developed a new methodology to map its claims; that the mapping cannot be completed until December 31, 1985, and that lands in all counties except Hunterdon, Morris, Sussex and Warren are subject to potential claims. He accepted Yunghan's testimony describing the mapping program and thus concluded that about 47% of the area to be mapped pursuant to P-13 will not be mapped by within one year of the adoption of the amendment. He then discussed plaintiffs' constitutional challenges. He considered them to be "doubtful." Nevertheless, he felt it unnecessary to decide these questions since his construction of the amendment obviated the problem.
Judge Simpson discussed the interpretation of the amendment at length. He noted that all parties seemed to agree that the obligation of the State under the amendment, that it specifically define and assert its claim pursuant to law, meant compliance with L. 1968, c. 404, involving the mapping program approved in Newark v. Natural Resources Council, supra, 82 N.J. at 530. The judge, however, found fault with this interpretation since the evidence showed that the mapping could not be completed within one year of the adoption of the amendment. Thus, the judge believed that owners of lands formerly flowed by tides would be treated differently. He perceived that the disparity *239 could raise constitutional questions. He pointed out that even before the amendment was approved the then Attorney General protested that the State could not comply with it. The judge then noted that the amendment did not refer to L. 1968, c. 404, nor did it otherwise indicate the meaning of the words "specifically defined" as used in the amendment. The judge felt that since the mapping could not be completed within one year after adoption of the amendment, the amendment must have meant something other than compliance with prior law. He also noted that, as used in the amendment, the words "asserted" and "pursuant to law" were not defined. See Dickinson v. Fund for the Support of Free Public Schools, supra at 338-339.
Ultimately, Judge Simpson ruled that as to the lands where the completed maps would not be filed within one year of the amendment, "All remaining claims will have been specifically defined and asserted pursuant to law by November 2, 1982 and fully delineated by December 31, 1985" by the Council filing on or before November 2, 1982 copies of P-13 and the photo base maps, and that all mapping pursuant to L. 1968, c. 404, be completed by December 31, 1985. The photo base maps would show the area within each square but without further delineation of the State's claim. On July 22, 1982 an order was entered in accordance with his opinion. On July 26, 1982 defendants appealed. On July 26, 1982 this court issued an order by consent accelerating the filing of briefs. On July 28, 1982 plaintiffs cross-appealed. Briefs were promptly filed. On August 23, 1982 we granted the motion of the New Jersey Land Title Association to appear as amicus curiae and to participate in oral argument. We heard oral argument on August 30, 1982.

Meaning of the Amendment
We think that the interpretation adopted by Judge Simpson was erroneous. The amendment provides that lands which have not been tide-flowed for a period of 40 years shall not be deemed riparian or subject to a riparian claim "unless during that period of time the State has specifically defined and asserted such a claim pursuant to law." With respect to lands not flowed *240 during the 40 years immediately preceding adoption of the amendment, the State was given an additional one year after adoption of the amendment to assert its claim. Neither the trial judge nor the parties have directed our attention to any statute other than L. 1968, c. 404, which authorizes state-wide mapping,[4] and we know of none. And in the time following the adoption of the amendment the Legislature has not provided by law for any other mapping procedure. We further point out that L. 1968, c. 404, was not an obscure or forgotten statute. Quite to the contrary, the Legislature had twice extended the time for the Council to "complete its studies and title surveys and make its determinations as to interest of the State in meadowlands throughout the State...." Originally the time was set for December 31, 1974. See L. 1968, c. 404, § 92. The time was extended prior to adoption of the amendment by the Legislature to 1977 and then 1980. L. 1975, c. 288, § 1; L. 1978, c. 44, § 1.
We also observe that there had been considerable prominent litigation concerning the mapping techniques being used. Judge Trautwein's decision suppressing the gray and white map was not reported. Yet we know from our own experience that his order was well known. Further, prior to adoption of the amendment other decisions arising from the mapping were published. See Newark v. Natural Resource Council, 133 N.J. Super. 245 (Law Div. 1974) (referring to the suppression order at 251-252), aff'd 148 N.J. Super. 297 (App.Div. 1977), certif. granted and remanded 75 N.J. 32 (1977), clarified and aff'd 152 N.J. Super. 458 (App.Div. 1977). Finally, we note that at hearings held on the amendment reference was made to the ongoing mapping program under L. 1968, c. 404. Representatives of the administration testified that the mapping could not be completed within the one year.[5]See Gormley v. Lan, supra, 88 N.J. at 30-31.
*241 We are not impressed with the suggestion that the amendment could not have referred to L. 1968, c. 404, since in fact the mapping could not have been completed within the one year. We know of no reason why it could not have been the intent of the amendment to preclude the State from making its claim beyond one year even though it was not possible for it to make it earlier. The amendment did not compel mapping; rather, it gave the consequence of a failure to act. We point out that the Legislature had originally directed that the studies be completed by December 31, 1974. L. 1968, c. 404, § 92. This deadline was not met. Surely the delay cannot be attributed to the landowners. Further, we note the understanding by the Supreme Court of the meaning of the amendment. In Gormley v. Lan, supra, 88 N.J. at 35, the court, in the interpretative statement it drafted, stated that the State might lose its claims "if for any reason the State does not assert such claims within that one year." Surely "any reason" embraces an inability to assert the claim. In reality, the people were quite plainly informed that the very thing which the trial judge thought they could not have intended would happen if the amendment passed. Nevertheless, it carried. Finally, we note that the Legislature, after the adoption of the amendment, passed no other statute to provide for mapping. The reason is quite clear. It perceived that none was needed. Thus, we hold that unless superseded by another statute "pursuant to law" in the amendment means pursuant to L. 1968, c. 404.
We further hold that the filing of P-13 and the base maps cannot constitute a specifically defined and asserted claim. The record is clear beyond any doubt that vast areas of P-13 will not ultimately, after accurate mapping, be the subject of a state claim. P-13 and the photo base maps simply show the area where the State may have a claim. If the filing of P-13 and the base maps without delineation of the state claim satisfies the amendment, then the amendment is devoid of all meaning. Certainly, in areas of the State not subject on P-13 to a claim of the State the landowners need no statement that there is no *242 riparian claim possible against their property. The landowners in Hunterdon, Warren, Morris and Sussex Counties already know that they are free of such claims. Thus, P-13 educates no one to anything not already perfectly obvious. If the amendment only required the filing of P-13 and the photo base maps to preserve the State claim, it achieved nothing. We ought not to construe a constitutional amendment to be meaningless.
In reality P-13 and the photo base maps are no more a valid statement of claim than the "hatched" areas described in Newark v. Natural Resource Council, supra, 133 N.J. Super. at 245. There it was held that a claim that property was probably State-owned did not satisfy the State's burden under L. 1968, c. 404. The court held that the State could not hedge: it had to specify that land was or was not State-owned. Since the amendment contemplated that L. 1968, c. 404, would be followed in the mapping, then a hedge cannot be permitted under the amendment either.
The insufficiency of P-13 and the photo base maps to satisfy either the amendment or the Council's duty under L. 1968, c. 404, is further illustrated by N.J.S.A. 13:1B-13.4. That section requires the Council to publish in a newspaper a list of parcels designated in whole or in part as state-owned lands. Surely the Council will not publish a list of all the properties within P-13.
We observe that the order to complete the mapping by December 31, 1985 can in no sense cure the insufficiency of P-13 and the base maps to satisfy the amendment. The amendment requires that the claim be asserted within one year of the adoption of the amendment. The completed maps cannot relate back. In reality, if the steps directed by the trial court will satisfy the amendment, it is difficult to perceive why a claim to the entire State would not have been equally valid.
We also point out that it can hardly be conceived that the Legislature in proposing the amendment or the people in adopting *243 it could have intended the State to act in bad faith. Yet it is clear that if P-13 and the photo base maps are filed without specific delineation of the State's claim on a property-by-property basis, the claim will not be made in good faith. It is of no assistance to a property owner to know that the claim against him is contingent only. He wants to know the actual status of his property.
With respect to the interpretation of the amendment we summarize our holding as follows. The State must within 40 years of a property not being tidally flowed file a claim pursuant to L. 1968, c. 404, that the property is riparian. The claim must be specific as to each property and must be prepared in accordance with the procedures approved in Newark v. Natural Resource Council, supra, 82 N.J. at 530. With respect to property not flowed within the 40 years immediately preceding adoption of the amendment the State has an additional one year from adoption of the amendment to define and assert its claim. If the claim is not filed, then the property not tide-flowed for 40 years will not be deemed riparian or State-owned. It is not our intention by our decision to preclude the Legislature from adopting a new statute replacing L. 1968, c. 404, or to forbid the introduction of new mapping techniques. We do hold, however, that the amendment precludes the State from claiming property unless, as to all property claimed, the claim is made in good faith in accordance with already approved or reasonable mapping techniques to be adopted in the future.
Plaintiffs on their cross-appeal urge that they are entitled to relief in lieu of the prerogative writ of mandamus. We see no basis to grant that relief. Nothing in the amendment compels the Council to file any claim. The amendment only specifies what will happen if the State does not act. Since the duty is not specific and certain, it cannot be ordered. Gallena v. Scott, 11 N.J. 231, 238 (1953). In any event, we would not order *244 the impossible. The record makes it clear beyond doubt that the entire State cannot be mapped by November 3, 1982.

Constitutional Issues
Our determination that the amendment will require particularized mapping within one year from its adoption, and our refusal to order such mapping, requires that we address the constitutional issues found unnecessary to decide by Judge Simpson. Plaintiffs contend on this appeal that the Fund for the Support of Free Public Schools is a perpetual trust fund; that the amendment unlawfully attempts to divest the State of its interest in the fund; that the amendment violates the contract clauses of the United States and New Jersey Constitutions, and that certain persons are denied equal protection of the laws by the amendment.
Preliminarily with respect to the constitutional questions, we think it would be helpful to consider further the legal impact of the amendment. The amendment, of course, by itself divests the State of nothing. Indeed, upon the adoption of the amendment the State owned precisely what it had previously owned. What the amendment does is simply require the State to assert its claim within a specified period. The amendment provides that the State specifically define and assert its claim within 40 years of a property becoming nontidal. In addition, in recognition of the fact that many properties possibly formerly tidal have been filled for more than 40 years, the amendment provided that with respect to such properties the State could specifically define and assert its claim within one year of its adoption. While we do not doubt that the amendment will come to be referred to as a statute of limitations, we emphasize that it does not require the State to institute litigation to protect its position. The amendment places a lesser burden on the State. The State need only define and assert its claim within 40 years of the land becoming free from tidal flow. This requirement should be contrasted with the general statute of limitations with respect *245 to recovery of real estate by the State. That statute, N.J.S.A. 2A:14-8, provides as follows:[6]
No person or body politic or corporate shall be sued or impleaded by the state of New Jersey for any real estate, or for any rents, revenues, issues or profits thereof, except within 20 years next after the right or title thereto or cause of such action shall have accrued.
We also point out that the State will presumably lose no particular piece of property by reason of adoption of the amendment and its failure specifically to define and assert a claim within the amendment's time constraints. This is because the burden of proof is on the State to establish ownership of property not flowed by tides. See O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 326-327. Nevertheless, at least theoretically and perhaps actually, the amendment will ultimately cause the State to lose property in two categories. The first category is property not tide-flowed for 40 years before the adoption of the amendment. If the State does not specifically define and assert a claim within one year of the adoption of the amendment, it will lose any claim to the property. This category may be subdivided into two parts. The first part is the property along the Atlantic to be almost fully mapped within one year of the adoption of the amendment. If a particular parcel there has not been tide-flowed for 40 years and the parcel as mapped is not shown as State-owned, the State claim will be extinguished. The second part is the property which has received the principal focus of this litigation  the property which is not to be mapped within the one-year period. This property is largely in the Delaware valley region.
The second category is land which has been tide-flowed within the last 40 years. An example would be a property tide-flowed 20 years ago. The State will have an additional 20 years to claim this property. Since all maps will be completed by December *246 31, 1985, if the State does not claim such property, then it will be because it determines that the property is not State-owned. This second category of property therefore will not be lost by default. If the State loses its claim to the property, it will be because of its determination that it does not have a claim.[7]
Plaintiffs do not seem to suggest that there is any constitutional impediment in the operation of the amendment to bar state claims to properties which the State affirmatively maps as not State-owned. Nor can we understand how any rational argument could be made that any provision in either the United States or the New Jersey Constitution precludes the people of this State by constitutional amendment from providing that if the State formally declares that it does not own a property and that if, in fact, the property has not been tide-flowed for 40 years, the State will be bound by this declaration. Plaintiffs instead focus and are concerned with the category of properties to which the State will lose its claim by default since it will not specifically define and assert its claim within the period allowed by the amendment. Accordingly, we address ourselves to the default situation. Our decision sustaining the amendment as to the default properties a fortiori sustains it as to the property which the State disclaims by mapping as privately owned.
In addition to considering the legal impact of the amendment, we should consider its practical effect. Plaintiffs have presented their case on their asserted and no doubt good faith belief that the State will lose substantial lands by default in the unmapped areas. Yet we really do not know the amount of the loss. It cannot be emphasized too strongly that in O'Neill v. *247 State Hwy. Dep't, supra, 50 N.J. at 326, 327, the Supreme Court held that the burden of proof is on the party who challenges the existing scene to show that it is not reflective of the actual tidal situation. See, also, Gormley v. Lan, supra, 181 N.J. Super. at 13. Thus, even though lands are mapped as State-owned, if they have not been flowed for 40 years the existing scene will place the burden of proof on the State to establish its ownership. To establish its ownership the State must initially show that the property was tide-flowed at some point in the past. But it is not enough for the State to prove that. If the lands gradually accreted, then the State lost its title. See Wildwood Crest v. Masciarella, supra, 51 N.J. at 357. Hence, in litigation in which property has been filled, the State, to satisfy its burden of proof, will have to show that the property has at one time been tide-flowed and had not accreted. The amendment will preclude the State from making that showing for property which has been tide-free for 40 years before the adoption of the amendment and which is not mapped and specifically defined and asserted to be State-owned within one year of adoption of the amendment.
We recognize that O'Neill v. State Hwy. Dep't was decided before the enactment of L. 1968, c. 404. We also are aware that the Supreme Court in Newark v. Natural Resource Council did not decide whether the maps "will satisfy either the burden of production or persuasion which the State may have" in quiet title actions. 82 N.J. at 542. We believe, however, that the O'Neill burden of proof flowing from the existing scene will not be changed. The maps filed under L. 1968, c. 404, are intended for the State to determine which meadowlands are State-owned. This includes those currently or formerly flowed by tide. N.J.S.A. 13:1B-13.1. Thus, the Council was directed in effect to map the current scene where there had been no disturbances changing the tidal condition of the property. Where there had been changes the Council could nevertheless claim the property as State-owned if appropriate data were developed. In some cases involving meadowlands it may be difficult to determine *248 whether property is currently flowed by mean high tide. See O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 323-324.
We cannot believe that the Legislature intended that in cases where the existing scene was indisputably nontidal the O'Neill burden of proof would be shifted. We note that L. 1968, c. 404, was enacted in direct response to O'Neill. The holding in that decision including the burden of proof was certainly well known to the Legislature. Yet the Legislature made no effort to shift the burden. Nor do we see why it should be shifted. The record in this case shows that the State has spent and will spend large sums to map its lands. An ordinary property owner can hardly match its resources. We think that the principles of O'Neill are no less valid when the State asserts its claim in gross to large areas rather than in individual cases. In O'Neill the State produced evidence of eyewitnesses that the property before being disturbed had been tide-flowed. It supported this evidence with a drainage report. Nevertheless, it had the burden of proof. Unless the O'Neill rule is continued, an individual property owner long in possession of his property in good faith with a record title and a history of having paid his taxes may find himself with the burden to prove that his property is his. We cannot accept this as the law.
We also note that the Supreme Court in State, by the Transportation Comm'r v. Resource Developm. Div. Council, 60 N.J. 199 (1972), decided several years after enactment of L. 1968, c. 404, again dealt with the O'Neill burden. While there is no indication in the opinion that the effect of that statute was considered in that case, it does appear that the court did not question the continuing validity of O'Neill with respect to burden of proof.
This court, of course, cannot now determine that the State can or cannot prove its claim as to any particular property flowed more than 40 years ago. In cases in which the claim is properly defined and asserted within one year, there is no doubt that the State will frequently have such opportunity. We can say, *249 however, that it would appear that the burden will not be lightly met. As observed by Chief Justice Weintraub in O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 326, records were not made with riparian disputes in mind. In response to our inquiry at oral argument it was represented that in general the State had not done well in riparian litigation. In view of its burden of proof this should not be surprising. We can reasonably believe that the older its proofs, the more difficult will be its burden. It may well be the case that the State will simply not be able to prove that lands not flowed for 40 years are State-owned. If it could not, failure to map them within the one-year period would not matter.
We now consider plaintiffs' contentions against the factual and legal background we have described. Plaintiffs contend that the amendment is invalid because the riparian lands have been constitutionally and statutorily dedicated to the Fund for the Support of Free Public Schools. See N.J. Const. (1947), Art. VIII, § IV, par. 2; N.J.S.A. 18A:56-1. They assert that the amendment is an attempt to convey property to private parties and therefore deprive the school fund of money that could be obtained from the sale of the lands.
Initially we point out that the riparian lands themselves are not the school fund. Rather, the lands are the source of the fund. Thus, proceeds from the sale of the lands must be paid into the fund. River Development Corp. v. Liberty Corp., supra, 51 N.J. Super. at 475. But the trustees of the fund do not have title to the property. American Dock & Imp. Co. v. Trustees of Public Schools, 35 N.J. Eq. 181, 263 (E. & A. 1882).
In any event, we need not long dwell on this point. We do not deal here with a legislative attempt to alienate riparian lands. Unquestionably such an attempt can raise constitutional questions. Traditionally, of course, conveyances of riparian lands have been challenged when the consideration for the conveyance has been inadequate. See Henderson v. Atlantic City, supra, 64 N.J. Eq. at 583. More recently, the public trust doctrine has *250 been reinvigorated. See Neptune v. Avon-by-the-Sea, 61 N.J. 296 (1972).
Regardless of what limitations the New Jersey Constitution may place on actions of the Legislature and the Executive Branch of government, it cannot place any substantive limits on the power of the people to adopt amendments to the Constitution.[8] Thus, the Constitution itself provides that the people have the right to alter and amend it. N.J. Const. (1947), Art. I, par. 2. The only limitation on the right of the people to amend the Constitution in accordance with its procedures is that the amendment must not violate a federal constitutional limitation. 16 Am.Jur.2d, Constitutional Law, §§ 31-32 at 344-346. Accordingly, a more recent constitution prevails over all provisions in a former one, Carpenter v. Cornish, 83 N.J.L. 696 (E. & A. 1912), and an amendment prevails over all existing statutes and any inconsistent existing provisions in the constitution being amended. 16 Am.Jur.2d, Constitutional Law, §§ 66-67 at 385-387. It thus follows that to the extent that plaintiffs rely on the dedication of the proceeds of sale of riparian lands to the school fund by statute and constitutional provision, their argument is without merit. Furthermore, even if the lands could not, by reason of the public trust doctrine, be legislatively alienated, this would be no bar to action of the people themselves.
Plaintiffs contend that the amendment violates the contract clauses of the United States Constitution. U.S. Const., Art. I, § 10.[9] Their argument is as follows. By L. 1980, c. 72, *251 § 5, (N.J.S.A. 18A:56-19), the New Jersey School Bond Reserve Act provided that there was established within the school fund "a school bond reserve in an amount equal to at least 1 1/2% of the aggregate issued and outstanding bonded indebtedness of counties, municipalities or school districts for school purposes, ... but not to exceed the moneys available in the fund." The purpose of the reserve was to provide a fund for the guarantee of the payment of school bonds if there were a default by a local school district. Plaintiffs point out that the source of the fund is money obtained from the sale of riparian lands. Plaintiffs contend that as a result of the amendment sales will be lost. Thus, the value of the security of holders of the bonds will be impaired.
Initially we are constrained to comment on how attenuated and hypothetical plaintiffs' argument is factually. To start with the only persons who could have standing to object on this basis would be persons who purchased bonds issued after the effective date of the act, July 16, 1980, and before the adoption of the amendment. Bonds issued after July 16, 1980 do include a statement that the bonds are secured under the provisions of the New Jersey School Bond Reserve Act. N.J.S.A. 18A:56-20. But purchasers of bonds issued after adoption of the amendment are on notice of the terms of the amendment.[10]
Secondly, the bonds are in any event the obligation of the issuing districts in the first instance. Thus, it is only upon local inability of the school district to make the payment that the reserve is used. N.J.S.A. 18A:56-18. Thirdly, nothing in the amendment in any way interferes with the bond reserve fund. Bonds issued after the effective date of the act continue to be secured by the fund. The fund as it was constituted is in no *252 way depleted by the amendment. Fourthly, as has already been demonstrated at some length, realistically there is serious doubt that even if the amendment had been rejected, the State could recover substantial money from property not tidally flowed for 40 years. Thus, as a practical matter we deal only with bonds issued over a period of less than 16 months, the security for which has not been in any way materially impaired. Further, where most of the riparian lands are situate the State's claim will be timely made. And in the areas where the claim is not made it is only property that has not been tide-flowed for 40 years that the amendment will affect. In all of the circumstances we can hardly conceive that a rating service which studies the matter will downgrade the bonds issued between the adoption of the reserve act and the amendment. Finally, we note that in any event the number of bonds involved will diminish as bonds are satisfied. Surely, a common sense approach would forestall an argument that the people of this State are precluded by the contract clause from adopting the amendment.
In any event, the amendment impairs no contractual obligation. The obligation is simply to establish and maintain a reserve within the school fund of money to guarantee the school bond indebtedness. N.J.S.A. 18A:56-17. Nothing in either the New Jersey School Bond Reserve Act or in the statement contained in the bonds issued after the passage of the act purports to preclude the State from in any way passing legislation or amending its Constitution so as to impact on future payments into the fund. See Fidelity Union Trust Co. v. N.J. Highway Auth., 85 N.J. 277 (1981), app. dism. 454 U.S. 804, 102 S.Ct. 76, 70 L.Ed.2d 73 (1981). In reality there has been no impairment of contract, factually or legally.
Plaintiffs rely heavily on United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). There the State violated its promise to the bondholders of the Port Authority of New York and New Jersey not to permit certain *253 revenues of the Authority to be used to cover mass transit deficits. The case is completely distinguishable. Here the State violated no promise to the bondholders and, in fact, the amendment can have no substantial impact on their security.
Plaintiffs' final contention that the Equal Protection Clause is violated because some persons' properties will be timely mapped and others will not is without merit. The persons whose properties are not timely mapped will be treated differently from persons who have purchased grants or whose properties are timely mapped and claimed.
It will be noted, of course, that the differential treatment is attributable to the administration of the amendment rather than the terms of the amendment itself. In such circumstances plaintiffs must show some totally arbitrary or invidious discrimination based on some improper purpose.[11]See Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446, 453 (1962); Abrahams v. Civil Service Comm'n, 65 N.J. 61, 74-75 (1974). Here there was no such showing. The State cannot map the entire State within the alloted period. It has allocated its resources rationally in selecting the areas. As Yunghans explained, the areas where the State mapped have most of the riparian land. The administrative problems justify the differing treatment. State v. Senno, 79 N.J. 216, 228-229 (1979).
We conclude that N.J. Const. (1947), Art. VIII, § V, par. 1, is in all respects valid and that the State, to comply with the amendment, must specifically define and assert a claim in accordance with L. 1968, c. 404, so that a good faith classification is made of any property claimed. The judgment of July 22, 1982 is reversed and the complaint dismissed.
*254 MICHELS, P.J.A.D. (dissenting in part).
By Art. VIII, § IV, par. 2, of the Constitution of 1947, and by N.J.S.A. 18A:56-5, the people of New Jersey have irrevocably dedicated their riparian lands to the support of their public schools. The permanent fund for the support of public schools, which is made up in part of revenues from the sale and lease of riparian land, is rigorously protected. By constitutional provision, the Legislature may not borrow, appropriate or use any part of the fund for any purpose but the support of public schools. N.J. Const. (1947), Art. VIII, § IV, par. 2. The riparian lands dedicated to the fund may not be transferred by gift, Garrett v. State, 118 N.J. Super. 594, 599 (Ch.Div. 1972), and may be sold or leased only with the independent approval of the Tidelands Resource Council, the Commissioner of the Department of Environmental Protection and the Governor. N.J.S.A. 13:1B-13.1. I cannot now accept that the people of this State would deny this historical commitment by assigning the State the impossible task of painstakingly mapping every square foot of its riparian claims within one year. For this reason, I dissent from that part of the court's opinion entitled "Meaning of the Amendment," and would affirm paragraphs 1, 2 and 3 of the order entered by Judge Simpson in the Law Division. Dickinson v. Fund for the Support of Free Public Schools, 187 N.J. Super. 320 (Law Div. 1981).
An analysis of the intent and meaning of this amendment is facilitated by an examination of its historical context. See Richman v. Ligham, 22 N.J. 40, 44 (1956). Until 1970 the State's tidelands claims were proved on an ad hoc basis, in response to quiet title actions or private persons' requests to use tideland areas. In response to our Supreme Court's suggestion that the State "do what is feasible to catalogue [its] far-flung holdings," O'Neill v. State Hwy. Dep't, 50 N.J. 307, 320 (1967), and in compliance with the newly-passed N.J.S.A. 13:1B-13.2, however, the State published a map of its claims to the Hackensack meadowlands in 1971.
*255 The map showed the State's claims in gray and privately-owned lands in white. In a massive condemnation action initiated by the Department of Transportation in 1971, this "gray and white map" was suppressed as evidence of the State's claims because it was based solely on older maps and so did not conform to N.J.S.A. 13:1B-13.3. See Newark v. Natural Resource Council, etc., 82 N.J. 530, 537 (1980), cert. den. 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980).
Over the next few years the Office of Environmental Analysis ("OEA") developed alternative methods of defining the State's claims to the meadowlands, which it hoped would prove legally sufficient. These methods included infrared aerial photography, tidal data, historical investigation, examination of plant life, and comparison to similar togography. See Newark v. Natural Resource Council, supra, 82 N.J. at 535. Immediately after the Natural Resource Council and the Commissioner of Environmental Protection accepted maps of the Hackensack and Newark-Elizabeth meadowlands in 1973, the legal sufficiency of these methods was challenged. That case involved a number of proceedings in several courts, and was not resolved until 1980. See Newark v. Natural Resource Council, 133 N.J. Super. 245 (Law Div. 1974), aff'd 148 N.J. Super. 297 (App.Div. 1977), certif. granted and summarily remanded 75 N.J. 32 (1977), clarified and aff'd 152 N.J. Super. 458 (App.Div. 1977), aff'd 82 N.J. 530 (1980), cert. den. 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980). As a result, it was not until 1980 that the State was assured that its efforts would be held legally sufficient.
Nonetheless, the OEA adopted the methods it had used in the meadowlands when, on January 1, 1979, it began a seven-year program to map the remainder of the State's tidelands claims. The program consists of complex and time-consuming historical, biological and topographical analyses of 2,452 square miles of land for evidence of present or former tide flow. The areas to be investigated were chosen on the basis of elevation, known tidal data, and other physical factors, as well as the investigators' extensive experience with the State's wetlands. The subject *256 areas are defined by 1,632 base maps, each representing a 1.5-mile square area, on a map entitled the "Department of Environmental Protection Project Index" and marked at trial as Exhibit P-13 [hereinafter "Project Index"].
By the time of trial more than half of the seven-year project had been completed. The researchers had mapped almost the entire Atlantic coast, but none of the coastal Delaware tidal region. The 1,100 square miles along the Delaware will not be mapped completely in the manner employed by the OEA until December 31, 1985.
Despite evidence of diligence on the State's part, and a fixed date in the near future upon which the State's claims would be mapped completely, the Legislature adopted in June 1981 the resolutions that eventually would become the tidelands amendment. We are now asked to assess the purpose and meaning of that amendment. Ordinarily, a constitutional provision is to be interpreted according to the intent of the voters who ratified it. Gangemi v. Berry, 25 N.J. 1, 16 (1957); Richman v. Ligham, supra, 22 N.J. at 44. In this case, however, the evidence that usually would be relevant to the issue of intent is conflicting and sparse. Therefore, this amendment must be construed according to two more general principles: first, that "[t]he Constitution should not be read to quarrel with the common sense of a situation," State v. Fioravanti, 46 N.J. 109, 122-123 (1965), cert. den. 384 U.S. 919, 86 S.Ct. 1365, 16 L.Ed.2d 440 (1966), and, second, that the Constitution must be interpreted to best serve and protect the people of the State. Kervick v. Bontempo, 29 N.J. 469, 480 (1959).

"Pursuant to Law"
The amendment bars the State from asserting claims to lands not tide-flowed for 40 years, unless it has "specifically defined and asserted such a claim pursuant to law." Neither the amendment nor the statement that accompanied it identifies the law that is to govern this process. A review of "the place[s] where ideas and arguments are commonly exchanged," Gormley v. *257 Lan, 88 N.J. 26, 44 (1981), gives no clear answer to the question. For example, hearings on the proposed amendment were held in Trenton on June 5, and in Linwood on July 23, 1981. Hearings on ACR-3037 and SCR-3023 before the Senate Judiciary Committee and Assembly Judiciary, Law Public Safety and Defense Committee, June 5, 1981 (hereinafter cited as Trenton Hearings); Hearings on ACR-3037 and SCR-3023 before the Assembly Agriculture and Environment Committee, July 23, 1981 (hereinafter cited as Linwood Hearings).
Although all the witnesses agreed that the OEA's existing mapping program could not be completed by November 3, 1982, none expressly equated the phrase "pursuant to law" with the complex procedure the OEA had adopted from its work in the meadowlands. Contemporary newspaper commentary was similarly equivocal: some commentators believed the meadowlands-type mapping was required, see e.g., the Trenton Times, October 8, 1981; but others told their readers that one year was sufficient time for the State to assert its claim, e.g., the Newark Star-Ledger, October 26, 1981.
Despite the apparent ambiguity of the amendment as presented to the voters, the majority concludes that "pursuant to law" was intended by the voters to refer to the meadowlands mapping statute, N.J.S.A. 13:1B-13.1 et seq. It reaches this conclusion by this reasoning: first, although by its terms the statute regards only meadowlands, defined as "lands now or formerly consisting chiefly of salt water swamps, meadows, or marshes," N.J.S.A. 13:1B-13.1(a), this was mere legislative oversight. In fact, the meadowlands mapping statute also applies to tidelands. Second, the Legislature must have intended to incorporate the meadowlands mapping statute into the tidelands amendment for it did not enact any other mapping statute after the amendment was adopted. Finally, the voters were "quite plainly informed" of this purported reference, because the statement accompanying the proposed amendment explained that the State would lose its claims if it did not assert them within the year "for any reason," and the voters should have understood this to mean an *258 inability to complete a complex analysis of the remaining tidelands. I disagree.
A review of the history of the meadowlands mapping statute, as well as its express language, shows that the statute was directed solely at the meadowlands areas. The mapping procedures required by that statute were applied to tidelands by the OEA solely on the assumption that they would likely pass legal muster in quiet title and condemnation proceedings. Even if, however, the Legislature intended the meadowlands mapping statute to govern the State's responsibilities under the tidelands amendment, it is clear this intention was not communicated to the voters.
It is clear from its history that the meadowlands mapping statute was intended to apply only to meadowlands and not to other tidelands. See N.J.S.A. 13:1B-13.1. Although New Jersey's courts have long recognized that the State holds title to tide-flowed lands, e.g., New Jersey Zinc & Iron Co. v. Morris Canal & Banking Co., 44 N.J. Eq. 398, 400-401 (Ch. 1888), aff'd o.b. 47 N.J. Eq. 598 (E. & A. 1980); Associates, etc. v. Jersey City, 8 N.J. Eq. 715, 718-719 (E. & A. 1850), it was long assumed that this title extended only to areas within the boundaries of water courses, such as beaches and tide-flowed streams and bays. See Porro & Teleky, "Marshland Title Dilemma: A Tidal Phenomenon," 3 Seton Hall L.Rev. 323, 324-326 (1972). It was not until 1961, in an unpublished opinion of this court in Sisselman v. State Highway Department, Docket A-769-59 (May 1, 1961), that our courts recognized state claims to New Jersey's thousands of acres of marsh and meadowland.
The Sisselman decision caused great public concern. In a public hearing held before the Senate Committee on Agriculture, Conservation and Natural Resources on April 23, 1968, a parade of witnesses described the shock created by the decision, the cloud it had placed on titles, and the various legislation that had been introduced to correct the problem but had been vetoed by Governor Hughes. See Hearings on SCR-41 (1968) before the Senate Committee on Agriculture, Conservation and Natural *259 Resources, April 23, 1968. As described by Porro and Teleky, 3 Seton Hall L.Rev., supra, at 325-326,
Due to this attempted expansion of the doctrine, hundreds of properties in New Jersey have been taken and used for state purposes without compensating the record owners or lien holders; prior homeowners of many years are being threatened with loss of title; prior grants and state deeds are being ignored; properties are being arbitrarily claimed and conveyed by the State to persons other than the record owners; and hundreds of cases remain pending and untried before the state courts awaiting processing with the National [sic: Natural] Resource Council.
One response to this "marshland title dilemma" was Senate Concurrent Resolution 41 (1968), which proposed a constitutional amendment to declare title in the record owners of much of the meadowlands. The resolution was strongly opposed by Governor Hughes and was rescinded by the Legislature on March 25, 1969. Assembly Concurrent Resolution 58 (1969). Another bill being considered in response to the meadowlands problem, however, Senate Bill 477, was passed and enacted into law. That law included the mapping provisions now codified at N.J.S.A. 13:1B-13.1 et seq. The law directs the Tidelands Resource Council "to undertake title studies and surveys of meadowlands throughout the State and to determine and certify those lands which it finds are State owned lands." It expressly applies only to marsh and meadowlands.
The majority here asserts that the meadowlands mapping statute was intended to apply to the tidelands, but did not do so expressly because the Legislature's attention was at the time directed to the Hackensack region only. In fact, there is no evidence at all that the Legislature intended the statute to apply to the tidelands. Then First Assistant Attorney General Judith Yaskin told the Senate committee which drafted the tidelands amendment that:
The legislature authorized the mapping of the Meadowlands only ten years ago. The State, despite that narrow legislative mandate, has been mapping in the entire State for the last ten years.
........
Specific mapping requirements were only for the Hackensack Meadowlands. [Trenton Hearings, supra at 5]
*260 It is true, as the majority observes, that the Tidelands Resource Council and the OEA have adopted the procedure required by the meadowlands statute in their mapping of the tidelands. But this is not, as the majority concludes, an acceptance of the meadowlands statute as establishing any mandatory procedure for the tidelands mapping. Instead, the relevant history suggests that the OEA adopted the meadowlands procedure merely to assure that its results would be admissible as evidence of the State's claims in quiet title and condemnation proceedings.
Finally, compliance with N.J.S.A. 13:1B-13.3 is not a "claim pursuant to law," because it is simply not a "claim." As noted by our Supreme Court, "the impact of these maps is limited. This is not a quiet title suit and these maps are not being measured against claims of private ownership in this case." Newark v. Natural Resource Council, supra, 82 N.J. at 542. The meadowlands statute is merely a statutory cataloguing procedure. It is not in any sense a claim to the land mapped. See, also, id. at 540, n. 2.
N.J.S.A. 13:1B-13.1 et seq., then, does not provide for the "claim pursuant to law" contemplated by the amendment. Neither do our statutes or case law provide any specific method by which the State may with definiteness assert riparian claims, short of final resort to quiet title suits under N.J.S.A. 2A:62-1 et seq. Therefore, the burden is on this court to divine the procedures the people intended to require of the State in asserting its claims. To do so it is necessary to determine, in light of the principal purpose of the amendment, the meaning of "specifically defined and asserted." In other words, given that no existing law defines the State's duties under the amendment, what did the voters likely intend those duties to be?

"Specifically Defined and Asserted"
The Supreme Court, in Gormley v. Lan, supra, 88 N.J. at 42, identified the "true purpose" of the tidelands amendment as "resolving the uncertainties of title caused by the riparian land *261 doctrine." In the statement it drafted to accompany the amendment, which was adopted by the Secretary of State and appeared on the ballot, it identified the amendment's primary purpose as being "to relieve owners of land from certain competing claims of ownership by the State." The amendment cannot achieve either of these goals, however. At best, the result of the State's asserting its claim will be notice of potential claim to those whose lands are claimed, and repose to those whose lands are passed over. Uncertainties of title will not be resolved, and owners will not be relieved of competing claims, until the State's title is actually litigated and judicially determined. Thus, the most the people could have intended the amendment accomplish is fair notice to landowners that their land might, subject to judicial determination, be subject to State claim and ownership.
Provision by way of remedy is best construed in light of the evil against which it is erected. Doremus v. Hawthorne Bd. of Ed., 5 N.J. 435, 453 (1950), app. dism. 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). The evil the tidelands amendment is intended to remedy, as defined in the statement provided the voters, is that "owners may be uncertain for years if the State has a claim to the land." As noted above, the only certainty the amendment can provide is fair notice to landowners. Therefore, the ultimate question in construing the amendment is how much notice the people intended the State to provide.
I begin by repeating my belief that the people of New Jersey did not intend arbitrarily to cut off an efficient mapping program, near to completion, and give up their claim to thousands of acres of land devoted to their public schools. Rather, the legislative history suggests that the amendment was intended to give relief to the landowner who is uncertain of the status of his land and must either "sue the state and attempt to acquire the title or ... purchase a grant from the state." Trenton Hearings, supra at 24 (testimony of Assemblywoman Hazel Gluck). As testified to by Robert Ferguson, a realtor,
I think we have to put ourselves in the position of a property owner who has paid taxes for ten, twenty, or thirty years or even more only to find that when *262 he goes to sell his property, he cannot convey the clear title and he may find that he doesn't own the property at all because, at one time, it may have been flowed by mean high tide. Title companies, most naturally, are reluctant to insure these titles and when we get back into the Atlantic and Cape May County areas, the situation, now, is compounded by the soaring values that have resulted from the advent of the casino industry. [Id. at 27]
Similarly, John McDermitt, a lawyer for several title insurance companies, testified that "I know of my own knowledge of hundreds, literally hundreds, of owners of lots, small residential parcels who are inhibited in the sale of those parcels or in the mortgaging of those parcels by the tardiness of the state in performing mapping requirements." Linwood Hearings, supra at 27.
Given this apparent intention to provide some certainty to affected homeowners, and given the extremely short time provided by the amendment, it is reasonable to read the amendment "as a mere directive to catalogue the State's claims quickly" so they may later be tested for their legal sufficiency. See Newark v. Natural Resource Council, supra, 82 N.J. at 540, n. 2. Compare the legislative mapping and filing procedures utilized in prior times under N.J.S.A. 12:3-1 et seq. See Bailey v. Council of the Div. of Planning, etc., 22 N.J. 366, 372 (1956); Bailey v. Driscoll, 19 N.J. 363 (1955). Surely, given the difficulty of the task and the weighty interests at stake, the State has done so adequately by publication of the Project Index (P-13) and the results of the mapping completed to date.
Ultimately, the search for the meaning of this amendment must proceed on the principle that "The Constitution was made to serve and protect the people of the State and all of its language must be sensibly construed with that uppermost in mind." Kervick v. Bontempo, supra, 29 N.J. at 480. Interpreting the amendment to forfeit lands held in public trust, in order to spare a relatively small number of landowners three years of uncertainty, would not serve or protect our people. It is the duty of this court to direct a more equitable and beneficial result.
*263 First, the people surely meant to require that the State do all it reasonably can to give notice to landowners whose property it likely will claim. I find that the DEP's Protect Index is sufficient to satisfy this requirement. Although it is not as precise as the ultimate result of the mapping procedure will be, it defines, with certainty and finality, an area that the State considers likely to include tidelands, based on elevation, existing tides and the State's expert opinion. Notice of the contents of the Project Index should be given to affected homeowners by the filing of the Index, and base photomaps that have not heretofore been filed, with the Secretary of State and county and municipal clerks.
Second, the purposes of the tidelands amendment would best be served by a responsive and efficient administrative procedure by which homeowners can obtain information and file competing claims. Such a procedure is described in N.J.S.A. 13:1B-13.5. Under it a homeowner, in lieu of or in conjunction with filing a complaint in Superior Court, may file a claim of title with the Natural Resource Council. Within 90 days the Council must issue a statement that it has no interest, release its interest by quitclaim deed, or reaffirm that all or part of the property is or may be State-owned. This procedure should be made a requirement of the tidelands amendment as well.
Finally, the amendment intends to give repose to landowners whose lands are unquestionably not tidelands. No administrative procedure or information service is of use to them. Thus, the State should be ordered to complete its analysis of the State's potential tidelands as quickly as possible, with an immediate emphasis on eliminating from its exploration areas for which there is little probability of a valid claim.
To this extent, I dissent from the majority opinion of the Court and would affirm the following paragraphs of the order under review:
1. On or before November 2, 1982 the Tidelands Resource Council file a copy of P-13, in the form attached to the written opinion, with the Secretary of State, together with a copy of each base photomap (excluding those reflecting only *264 uplands) that has not previously been filed with a scribed overlay and Claims Overlay Preparation Summary, in accordance with N.J.S.A. 13:1B-13.4.
2. Concurrent with such filing, the Tidelands Resource Council shall file copies of P-13 and the respective base photomaps to the clerks of the counties and governing bodies of the municipalities whose political boundaries include lands shown on such maps-paralleling the distribution of published maps under N.J.S.A. 13:1B:-13.4.
3. The action taken pursuant to paragraphs one and two above shall constitute compliance with Art. VIII, § 5, par. 1 of the 1947 Constitution of New Jersey as amended, to specifically define and assert claims of the State, pursuant to law, as to lands formerly tidal flowed but not tidal flowed for 40 years prior to the amendment  and within the one-year period provided in such amendment.
NOTES
[1] Of course, the State could not deprive a private owner of his property by dredging it and thus allowing the property to be tide flowed. See O'Neill v. State Hwy. Dep't, supra, 50 N.J. at 324.
[2] This is quite independent of a claim that could be made in an appropriate case that property, though originally properly mapped as privately owned, had by reason of erosion become State-owned. See Wildwood Crest v. Masciarella, supra, 51 N.J. at 357.
[3] Including its predecessor councils.
[4] As long ago as 1864 the Legislature did provide for mapping of certain areas of the State. See L. 1864, c. 391.
[5] The prediction will prove to be accurate.
[6] The statute, notwithstanding its clear and seemingly all-embracing language, has been held not to apply to riparian lands. See State v. Owen, 23 N.J. Misc. 123 (Sup.Ct. 1945).
[7] There may be some Delaware River properties that within the last 40 years have been flowed by tide but become tide-free for more than 40 years before they are mapped and claimed. This is because the Delaware maps will not be completed for three more years. These properties may be lost by default. Thus, they are in no different situation than the properties along the Delaware already tide-free for 40 years at the time of the adoption of the amendment.
[8] Of course, amendments must be adopted procedurally, in accordance with the Constitution. See N.J. Const. (1947), Art. IX. Plaintiffs point to no procedural infirmity in the adoption of the amendment.
[9] There is a serious standing question on this point since the purchaser of the bond involved acquired it after adoption of the amendment. But in view of the importance of settling the issue, we prefer to deal with the issue on the merits. Plaintiffs also assert a violation of the impairment clause of the New Jersey Constitution. N.J. Const. (1947), Art. 4, § 7, par. 3. As already noted, the amendment cannot violate the State Constitution.
[10] It appears that purchasers of bonds issued before July 16, 1980 get the benefit of the fund. But they can assert no "right" to it.
[11] Plainly, the higher degree of scrutiny required when fundamental rights or suspect classifications are involved are not applicable in this property case. See Right to Choose v. Byrne, 91 N.J. 287 (1982); Robinson v. Cahill, 62 N.J. 473, 491 (1973), cert. den. sub. nom. Dickey v. Robinson, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973).